**BLACK DIAMOND FUND, LLLP, Wealth Strategy Partners, and Harvey Altholtz, Plaintiffs–Appellants,**

v.

**Fred J. JOSEPH, Colorado Securities Commissioner, and Colorado Division of Securities, Defendants–Appellees.**

No. 08CA0883.

Colorado Court of Appeals, Div. IV.

May 28, 2009.

Isaacson Rosenbaum P.C., David A. Zisser, Denver, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Russell B. Klein, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge RICHMAN.

Black Diamond Fund, LLLP (BDF), an issuer of limited partnership interests; Wealth Strategy Partners (WSP), the general partner of BDF; and Harvey Altholtz, the individual member of WSP who conducted the activities of BDF (collectively respondents), appeal from a final order of the Colorado Securities Commissioner directing them to cease and desist from committing or causing any violations of sections 11–51–301, –401, and –501, C.R.S.2008, of the Colorado Securities Act (CSA), or engaging in conduct in violation of any provision of the CSA. We affirm in part, reverse in part, and remand with directions.

The Commissioner's order adopts findings of fact and conclusions of law entered by a three-member panel of the Commission after a contested hearing conducted pursuant to section 11–51–606(1), C.R.S.2008. The panel found and concluded that respondents had violated the CSA, specifically through (1) the sale of unregistered securities in violation of section 11–51–301; (2) the employment of an unlicensed securities sales representative in violation of section 11–51–401(2); and (3) the offer and sale of securities in violation of section 11–51–501(1). The panel recommended that the Commissioner issue a cease and desist order against respondents.

Respondents seek judicial review of the Commissioner's order, a final agency decision, pursuant to sections 11–51–607 and 24–

4–106, C.R.S.2008, contending that the order is not supported by substantial evidence, is not consistent with legal authority, and imposes arbitrary and capricious sanctions. We agree that the Commissioner's one express finding that respondents sold securities "in a fraudulent manner" is not supported by the evidence and remand for correction as to that aspect of the order, but we affirm all other aspects of the Commissioner's order finding violations of the CSA.

## I. Standard of Review

Section 11–51–607(1) provides that "[a]ny person aggrieved by a final order of the securities commissioner may obtain a review of the order in the court of appeals pursuant to the provisions of section 24–4–106(11), C.R.S." The standard for review of such actions is found in section 24–4–106(7), which provides that the court shall affirm the agency action unless it finds, insofar as pertinent here, that the agency action was arbitrary and capricious, an abuse of discretion, or based on findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence, or otherwise contrary to law. In making these determinations, the court shall "review the whole record or such portions thereof as may be cited by any party" and "determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established." § 24–4–106(7).

An appellate court must consider whether the Commissioner's decision is supported by "substantial evidence" in the record viewed as a whole. *Colorado Office of Consumer Counsel v. Pub. Utils. Comm'n*, 786 P.2d 1086 (Colo.1990); *Westmark Asset Mgmt. Corp. v. Joseph*, 37 P.3d 516, 520 (Colo.App.2001). Substantial evidence is the quantum of probative evidence that a fact finder would accept as adequate to support a conclusion, without regard to the existence of conflicting evidence. *Westmark Asset Mgmt.*, 37 P.3d at 520.

We review an agency's conclusions of law de novo. *Sigala v. Atencio's Market*, 184 P.3d 40, 42 (Colo.2008); *Davison v. Indus. Claim Appeals Office*, 84 P.3d 1023, 1029 (Colo.2004). "Although a reviewing court gives some deference to an agency's reasonable construction of a statute, the agency's interpretation will be overturned on appeal if it is 'clearly erroneous, arbitrary, or otherwise not in accordance with the law.'" *Sigala*, 184 P.3d at 42 (quoting *Davison*, 84 P.3d at 1029).

## II. Background

BDF conducted an offering of up to $10 million in partnership interests as described in a confidential private placement memorandum (PPM) dated April 18, 2007. There is no dispute that these interests are securities as defined by the CSA. BDF offered the securities primarily through persons described by Altholtz as "finders" and to whom respondents would pay a five percent finder's fee upon completion of each subscription with BDF. Altholtz testified that there were at least fifty finders nationwide and at least five in Colorado, and that William Allan Gay was one such finder operating in Colorado.

On December 14, 2006, Gay had entered into a Letter of Consent with the National Association of Securities Dealers (NASD) which permanently barred him from associating with any member of the NASD in any capacity. The bar arose from the fact that Gay had engaged in private securities transactions without approval of his employer firm and had sold at least forty-six promissory notes for $4.6 million in violation of NASD conduct rules.

On May 10, 2007, Gay entered a Stipulation and Consent with the Colorado Division of Securities revoking his investment advisor license due to his bar by the NASD. On October 24, 2007, the Denver District Court entered a permanent injunction which enjoined Gay from "associating in any capacity with any broker-dealer, sales representative, promoter, issuer, financial planner, [or] investment advisor ... engaged in business in Colorado."

Altholtz had known Gay for approximately ten years and personally arranged for Gay to act as a finder in the BDF offering. Altholtz was aware in May 2007 that Gay was "having problems" with the Securities Division, but

testified he thought they were resolved when Gay surrendered his investment advisor license. Altholtz testified that when he learned Gay lost his investment advisor license, he consulted with counsel and was advised that that fact should not have an impact on Gay's ability to act as a finder in connection with BDF's offering. When Altholtz learned in January 2008 of the permanent injunction, he terminated BDF's relationship with Gay.

Altholtz knew that Gay was marketing the BDF securities to Colorado residents by inviting them to "free lunch" and "free dinner" investment seminars which Gay sponsored. Altholtz claimed that he was aware of restrictions against publicly advertising and engaging in general solicitation of a purportedly exempt offering under SEC Rule 506 of Regulation D, but he did not convey information about such restrictions to Gay and had no written agreement with Gay restricting his agency or placing limitations on his ability to solicit investors.

One investor who attended a seminar sponsored by Gay in July 2007 testified that she received an invitation to the seminar through the mail, as did most of the people in her neighborhood, although she had no prior relationship with Gay. At the seminar, Gay described investments generally but did not specifically refer to the BDF offering. Approximately one month after the seminar, and at subsequent meetings, Gay discussed the BDF investment opportunity with her, and she invested more than $300,000 in BDF.

Another seminar, consisting of both a luncheon and a dinner and held on November 13, 2007, was co-sponsored by Altholtz, who testified that he authored the written invitation sent to prospective attendees. The invitation, sent over Gay's signature, stated that Gay has "been in the investment business for quite some time, having seen many different investment vehicles come and go" and that he wished to report "that the most interesting, and by far the most lucrative investment model" he had ever encountered came "by way of a long time friend from the east coast," later identified in the letter as Altholtz. Altholtz attended both seminars on November 13, 2007, made presentations

about PIPE (Private Investment in Public Equity) investments generally, and used BDF as a sample investment.

Altholtz testified that he had little direct contact with investors other than at the November 13, 2007 seminar. The panel found Altholtz's activities related to the offering included (1) making presentations and responding to occasional questions, (2) receiving subscription agreements from investors and through finders such as Gay and, ultimately, accepting them, and (3) paying finders.

The panel found that Gay was an agent for BDF whose activities included (1) locating prospective investors, (2) discussing BDF with them, (3) obtaining signed subscription agreements and checks from investors, and (4) sending the agreements and checks to Altholtz. The panel found, and it was uncontested, that Altholtz had an oral agreement with Gay to pay him five percent of the amount invested by each investor Gay introduced to BDF. WSP issued at least twenty-nine checks payable to Gay for sales commissions based on investors he brought to BFD between May 10 and December 7, 2007.

BDF had filed a Form D with the Securities Division, claiming the availability of a Rule 506 exemption under Regulation D. The PPM described the offering as being conducted pursuant to Section 4(2) of the Securities Act of 1933 and in a manner "[c]onsistent with Rule 506 of Regulation D promulgated under the Securities Act of 1933." The panel found that respondents' conduct amounted to general advertising or public solicitation, contrary to the rules promulgated under Regulation D.

### III. Analysis

#### A. Sale of Unregistered Securities

■ The sale of unregistered securities in Colorado violates section 11–51–301, unless the securities are exempt from registration. Section 11–51–605, C.R.S.2008, provides that "[i]n any proceeding under [the CSA], the burden of proving an exemption or an exception from a definition is upon the person claiming it." *See also Western–Realco Ltd. P'ship 1983–A v. Harrison,* 791 P.2d 1139,

1143 (Colo.App.1989) (party asserting affirmative defense of exemption from registration has burden of proving entitlement to exemption).

Nonetheless, respondents contend that *Busch v. Carpenter*, 827 F.2d 653, 657 (10th Cir.1987), stands for the proposition that once they establish a prima facie showing that the exemption applies, the burden shifts to the opposing party to come forward with sufficient evidence to establish that the exemption is unavailable. In *Busch*, an appeal from a summary judgment in favor of the issuer of allegedly exempt unregistered securities, the court held that after an issuer made a prima facie showing of entitlement to an exemption, "[i]t seems more logical to us to impose on the other party the burden of producing *some* contrary evidence on this issue when the seller claiming the exemption has satisfied the facial requirement of the statute." *Id.* (emphasis added). Although we believe *Busch* merely sets forth a procedure specific to weighing summary judgment motions and does not restate the allocation of the burden of proving an exemption, to the extent it is inconsistent with section 11–51–605, we decline to follow it.

It is undisputed that respondents sold unregistered securities of BDF. Respondents assert that they established an exemption from registration pursuant to SEC Rule 506, 17 C.F.R. § 230.506. Rule 506 is a federal regulation establishing a registration exemption pursuant to Section 4(2) of the 1933 Securities Act. 15 U.S.C. § 77d(2). Under Colorado law, a transaction in compliance with SEC Rule 506 is an exempt transaction. *See* § 11–51–308(1)(p), C.R.S.2008.

SEC Rule 506 incorporates the restrictions of SEC Rule 502, 17 C.F.R. § 230.502, which sets forth the general conditions for sales made under Regulation D, and specifically limits the manner in which a security may be offered for sale. Rule 502(c) provides, in pertinent part, as follows:

> [N]either the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, including, but not limited to, the following: ...

> (2) Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising....

17 C.F.R. § 230.502(c).

■ Whether respondents could avail themselves of the Rule 506 exemption turned on whether they offered or sold securities of BDF by any form of "general solicitation or general advertising" within the meaning of SEC Rule 502(c).

Respondents, relying in part on two no-action letters issued by the SEC, urge that the seminars did not constitute a general solicitation. *E.F. Hutton*, SEC No–Action Letter, 1985 SEC No–Act LEXIS 2917 (Dec. 3, 1985) (E.F. Hutton letter); *Bateman Eichler, Hill Richards, Inc.*, SEC No–Action Letter, 1985 SEC No–Act LEXIS 2918 (Dec. 3, 1985) (Bateman Eichler letter). In the E.F. Hutton letter, the SEC took the position that a general solicitation would not violate Rule 502(c) if Hutton's relationship with the invitees was "established prior to the time Hutton began participating in the Regulation D offering," that is, if it had a preexisting relationship. 1985 SEC No–Act LEXIS 2917, *2. In the Bateman Eichler letter, the SEC concluded that the proposed activity would not constitute a general solicitation because Bateman Eichler "would not make reference to any specific investment currently offered or contemplated for offering by Bateman Eichler" and would "implement procedures designed to insure that persons solicited are not offered any securities that were offered or contemplated for offering at the time of the solicitation," and "a substantive relationship [would be] established with the offeree between the time of the initial solicitation and the later offer." 1985 SEC No–Act LEXIS 2918, *1–2. Even accepting these nonbinding SEC no-action letters as guidance for the activities of respondents in this case, we conclude they do not support BDF's position that it did not engage in a "general solicitation."

The panel here found that a general solicitation had occurred because (1) Altholtz knew that BDF's "finder," Gay, marketed partnership interests in BDF to Colorado residents through "free lunch" and "free dinner" seminars; (2) Altholtz took no affirma-

tive steps to ensure that Gay invited only persons with whom he had a preexisting relationship; (3) at least one attendee at the July 2007 seminar had no preexisting relationship with Gay, yet had received an invitation through the mail, as had "most of the people in [her] neighborhood"; (4) BDF sent a follow-up letter to this attendee when she became an investor, welcoming her as an investor and urging her to mention the BDF investment to her friends and neighbors; (5) Altholtz co-sponsored the seminar held in November 2007 and prepared the invitation addressed anonymously to "dear valued client," undermining a suggestion that all the invitees were identified preexisting clients of Gay and, in any event, urging the addressee to "feel free to invite a guest," further undermining the suggestion that the attendees were persons with preexisting relationships with Gay; (6) Altholtz gave a presentation about BDF to attendees at the November 2007 seminar; and (7) BDF used approximately fifty sales agents nationwide referred to as finders.

The record also supports the panel's finding that respondents offered or contemplated offering for sale interests in BDF at the time of the free meal seminars. Respondents offered no evidence that between the time of these seminars and the time Gay offered the BDF securities to the invitees he had otherwise developed a "substantive relationship" with them.

Because substantial evidence supports the panel's finding that respondents engaged in a general solicitation, and thus the offering was not conducted in accordance with Rule 506, respondents have not met their burden of proving that the BDF securities were exempt from the registration requirements under section 11–51–308(1)(p). The Commissioner's conclusion that respondents' sale of the unregistered securities violated section 11–51–301 is supported by the record as a whole.

### B. Employment of Unlicensed Sales Representative

■ Section 11–51–401(2) prohibits an issuer of securities from engaging an individual to act as a sales representative unless the sales representative is licensed or exempt from licensing under section 11–51–402, C.R.S.2008.

The Commissioner found that BDF employed Gay, an unlicensed sales representative, in violation of section 11–51–401(2). While BDF does not dispute that Gay was not licensed as a sales representative, it contends that the Commissioner's finding that Gay was a sales representative is not supported by substantial evidence and is not consistent with the language of the CSA. We do not agree.

BDF contends that it did not violate section 11–51–401(2) because Gay did not meet the definition of "sales representative," a term defined in the act as an "individual, other than a broker-dealer, ... authorized to act and acting for a broker-dealer in effecting or attempting to effect purchases or sales of securities." § 11–51–201(14), C.R.S.2008. The term "effecting or attempting to effect purchases or sales" is not further defined in the statute. BDF argues that Gay's actions did not constitute "effect[ing] or attempt[ing] to effect the sale" of BDF securities, but rather were mere "offers to sell." BDF contends that only Altholtz could "effect" the sale of interests in BDF, and therefore Gay could not have been a sales representative.

BDF's argument on appeal rests on the language in one paragraph of the panel's initial decision, in which it found that Gay, among other things, "facilitated all aspects of the investment other than the formal acceptance of the subscription agreements (which was accomplished by Altholtz)." We do not agree that the formal acceptance of subscriptions determines whether Gay was a sales representative.

We find support for this conclusion in federal securities law. *People v. Prendergast,* 87 P.3d 175, 179 (Colo.App.2003) (interpretations of federal securities law are persuasive in interpreting the CSA); *People v. Rivera,* 56 P.3d 1155, 1163 (Colo.App.2002). The definition of "sales representative" in section 11–51–201(14) resembles the definition of "broker" in the 1934 Securities Exchange Act, 15 U.S.C. § 78c(a)(4)(A), which provides, "The term 'broker' means any person engaged in the business of effecting transac-

tions in securities for the account of others." Both definitions use the term "effecting" with respect to the sale of or transaction in a security on behalf of another.

The SEC has identified transaction-based compensation as indicative of whether one is a broker because such compensation is triggered by the "effecting" of a sale. *Herbruck, Alder & Co.*, SEC No–Action Letter, 2002 WL 1290291 (June 4, 2002) ("the receipt of compensation related to securities transactions is a key factor that may require an entity to register as a broker-dealer"); *1st Global, Inc.*, SEC No–Action Letter, 2001 WL 499080 (May 7, 2001) (recognizing that customer protection standards are served when one with a "salesman's stake" in a securities transaction is required to register); *Wirthlin*, SEC No–Action Letter, 1999 WL 34898 (Jan. 19, 1999) (recognizing transaction-based compensation as being a hallmark of broker-dealer status when fee is based on consummation of transaction).

The record supports the Commissioner's finding that Gay received transaction-based compensation. Specifically, the record shows that Gay (1) had an oral agreement with Altholtz to receive a five-percent fee upon completion of each subscription with BDF, (2) received compensation from BDF (through WSP) based only on the amount of BDF securities sold to the parties he had located, and (3) was, at a minimum, attempting to effect purchases or sales of the securities.

■ Individuals who solicit investors by phone and in person, and who distribute documents and prepare and distribute sales circulars in the hope that potential investors will deposit money in the account, are seeking to effect securities transactions. *SEC v. Deyon*, 977 F.Supp. 510, 518 (D.Me.1997), *af'd*, 201 F.3d 428, 1998 WL 1247116 (1st Cir. July 1, 1998) (unpublished decision). Effecting transactions in securities is shown by actively soliciting clients, selling securities to the clients, and participating in securities transactions "at key points in the chain of distribution." *SEC v. Nat'l Executive Planners, Ltd.*, 503 F.Supp. 1066, 1073 (M.D.N.C. 1980); *see also SEC v. Margolin*, 1992 WL 279735 (S.D.N.Y. Sept.30, 1992) (unpublished

opinion and order) (finding actor who received transaction-based compensation, advertised for client, and possessed client funds was broker).

The Commissioner specifically found, based on Altholtz's testimony, that Gay "located prospective investors, discussed the [interests in BDF] with prospective investors, obtained signed subscription agreements and checks for prospective investors, and sent the agreements and checks to Dr. Altholtz." He found that Gay "facilitated all aspects of the investment other than the formal acceptance of the subscription agreements" and "[a]t a minimum was attempting to effect purchases or sales of [interests in BDF]." Under these circumstances, the Commissioner's determination that Gay was a sales representative who was effecting or attempting to effect sales of BDF securities was supported by evidence and in accord with the CSA. By employing Gay, an unlicensed sales representative, BDF violated section 11–51–401(2).

### C. Violation of Section 11–51–501

■ Respondents contend that the Commissioner's express finding that they sold securities in a "fraudulent manner" in violation of section 11–51–501 is not supported by substantial evidence and is an improper interpretation of the scope of that statute.

Section 11–51–501(1) makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to engage in any of the following specified acts:

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

The panel in this case concluded that respondents' "failure to disclose Mr. Gay's li-

censure status as it changed during the period of the offering, was an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," and therefore respondents violated section 11–51–501(1). The panel did not specify which subsection of 11–51–501(1) respondents had violated, but it is apparent from the specific findings and conclusion that the panel was referring to subsection (b).

The Commissioner's final agency decision concludes that respondents offered and sold securities "in a fraudulent manner" in violation of section 11–51–501, without specifying any subsection of that statute or expressly describing the practices that constituted such violation. The phrase "fraudulent manner" is not defined in the statute.

Respondents first contend that the Commissioner should not have made the finding that they sold securities in a "fraudulent manner," as there was no such express finding by the panel and no evidence to support a finding of fraudulent conduct.

We agree that the phrase "fraudulent manner" does not appear in the panel's findings or conclusions. We also agree that such language should not appear in the Commissioner's final agency decision, as the only conduct found to be in violation of section 11–51–501(1) was the omission to state the material facts, as set forth above. Since we agree, as discussed below, with the Commissioner's position that a violation of section 11–51–501(1)(b) does not require scienter, that is, intent to defraud, the final agency order should not describe BDF's practices as "fraudulent." The Commissioner's final decision must be remanded for correction of this conclusion.

Respondents also contend that the Commissioner and the panel erred in concluding that respondents violated section 11–51–501 because (1) there was no evidence or finding that respondents made the omissions with scienter, that is, with intent to defraud; (2) no statement was rendered misleading by respondents' omission to disclose Gay's licensure status and, in any event, Gay's licensure status was not a material fact; and (3) Gay's licensure status was public information, and

therefore its disclosure was not required. We disagree with these contentions and address them in turn.

### 1. Scienter

Respondents, relying on *People v. Terranova*, 38 Colo.App. 476, 480–81, 563 P.2d 363, 365 (1976), argue that a violation of section 11–51–501 requires proof of scienter, that is, intent to defraud. They contend that since the panel did not find that their failure to disclose Gay's licensure status was the result of intent to defraud, the conclusion that they violated section 11–51–501(1) is not supported by the record. Given our understanding that the panel and the Commissioner concluded that respondents' violation of this section was due solely to the omission to state material facts as proscribed by section 11–51–501(1)(b), we disagree with the contention that evidence of an intent to defraud is required in this administrative action.

■ Insofar as the provisions of Colorado securities laws parallel federal statutes, federal authorities are persuasive in interpreting the CSA. *Prendergast*, 87 P.3d at 179. Respondents correctly state that the provisions of section 11–51–501(1), and its predecessor provisions, have been found by our courts to be analogous to Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5 promulgated by the SEC, 17 C.F.R. § 240.10b–5. *People v. Riley*, 708 P.2d 1359, 1363 (Colo.1985) (applying section 11–51–123(1), C.R.S. (1985 Supp.)); *Terranova*, 38 Colo.App. at 480, 563 P.2d at 365–66 (applying section 11–51–125(1), recodified as section 11–51–123); *Prendergast*, 87 P.3d at 179 (applying section 11–51–501).

The federal law enforcing Section 10(b) of the 1934 Act and Rule 10b–5 depends, in part, on the judicially-created private right of action insofar as civil liability is concerned, *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196–97, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and the statutory enforcement authority given to the SEC insofar as administrative liability is involved, *see* 15 U.S.C. § 78u(d) (Section 21(d) of the 1934 Act). The CSA, however, contains its own express provisions for administrative enforcement, crimi-

nal prosecution, and civil liability. §§ 11–51–601, –602, –603, –604 & –606, C.R.S.2008.

When construing a Colorado securities statute, we apply fundamental principles of statutory construction before resorting to case law regarding similar federal statutes and regulations. *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1100 (Colo.1995). In construing a statute, our primary task is to ascertain and give effect to the intent of the General Assembly, as expressed in the language it selected, giving the words their plain and ordinary meaning. If the language is clear and the intent appears with reasonable certainty, there is no need to resort to other rules of statutory construction. *People v. Shinaut*, 940 P.2d 380, 382 (Colo.1997). We read and consider statutes as a whole, construing each provision in harmony with the overall statutory scheme, structure, and purpose. *Whitaker v. People*, 48 P.3d 555, 558 (Colo.2002).

Before extrapolating from federal law to determine whether scienter is required for a violation of section 11–51–501(1)(b), we look first to the enforcement provisions of the CSA, and the Colorado case law interpreting those provisions, to determine the intent of the statute.

We first note that for purposes of civil liability, the current version of the CSA separately creates liability for any person who "recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11–51–501(1)." § 11–51–604(3), C.R.S. 2008. Thus civil liability under section 11–51–604(3) will arise upon a showing of "intent to defraud" but also may be established by a lesser showing of reckless conduct. In addition, the statute separately addresses civil liability solely for a violation of section 11–51–501(1)(b), providing liability where the seller fails to sustain the burden of proving that the buyer did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. § 11–51–604(4), C.R.S.2008. This subsection does not expressly require intent to defraud, or recklessness, to establish the seller's liability.

A separate statute, section 11–51–602(1), C.R.S.2008, provides for the Commissioner's enforcement of the CSA by means of injunctive relief whenever it appears that any person has engaged in or is about to engage in any act or practice constituting a violation of the CSA. The statute contains a separate and additional requirement of proof of "scienter" if the Commissioner also seeks damages, restitution, or disgorgement as part of the proceeding. § 11–51–602(2). This statutory language leads to the conclusion that where the Commissioner does not seek damages, scienter is not required to be proved. In the instant case, where the Commissioner issued only a cease and desist order under section 11–51–606(1.5)(d)(IV) and did not seek damages, restitution, or disgorgement, we hold that proof of scienter is not required to support an administrative order proscribing violations of section 11–51–501(1)(b).

In so holding, we do not disregard the requirement that a specific mens rea of willful conduct is required in a criminal prosecution under the statute as the division held in *Terranova*. Section 11–51–603 expressly provides for criminal prosecution of a person who "willfully" violates the statute. *See also Riley*, 708 P.2d at 1365 ("When an accused is charged with violating [a predecessor statute] by making an untrue or misleading statement of material fact in connection with the sale of securities, it is incumbent upon the prosecution to prove beyond a reasonable doubt that the accused was *aware* that he was making an untrue statement of material fact or was *aware* that he omitted to state a material fact necessary to make the statement not misleading in light of the circumstances under which it was made.... Essential to a conviction is proof beyond a reasonable doubt that the defendant acted with the culpable mental state of 'willfully.' "). But in the case of administrative enforcement based solely on violation of section 11–51–501(1)(b), we conclude that proof of scienter is not required.

### 2. Omission of Material Statements

Respondents contend that whether intentional or not, the nondisclosure of Gay's licensure status did not constitute the omission of a material fact necessary in order to make statements made in the PPM not mis-

leading, and that neither the panel nor the Commissioner identified any statements rendered misleading as a result of the nondisclosure.

There is no dispute that on December 14, 2006, Gay entered into a consent order barring him from association with any member of the NASD; on May 10, 2007, Gay's investment advisor license was revoked by the Colorado Division of Securities; and on October 24, 2007, Gay was enjoined from "associating in any capacity with any promoter or issuer of securities in Colorado." In addition, Altholtz testified he knew in May 2007 that Gay was "having problems" with the securities division, he consulted with counsel about the ramifications of the license revocation, and when he learned of the permanent injunction he terminated Gay's relationship with BDF.

It is true that the PPM issued in April 2007 does not mention BDF's relationship with Gay, nor does it make any statements about his background or licensing status, or the background or licensing status of any of the finders. But Gay's license was not revoked, and he was not enjoined from associating with issuers, until after the PPM was circulated. A misrepresentation under the CSA may occur in the context of a registration statement, or in the promotion or negotiations for the sale of an exempt or non-exempt security. *Lowery v. Ford Hill Investment Co.*, 192 Colo. 125, 135, 556 P.2d 1201, 1209 (1976). The issue here is not whether Gay could continue to act as a finder for BDM after his license was revoked, as Altholtz testified, but rather whether respondents should have disclosed that information, when it became known to them, in order to make other information not misleading.

The Commissioner concluded that such information should have been disclosed, and we agree that evidence in the record supports his conclusion.

As noted above, Altholtz testified that he prepared the letter to prospective investors inviting attendance at the November 2007 seminar, co-sponsored by BDF, notwithstanding that the letter was signed by Gay. It stated that Gay had "been in the investment business for quite some time" and oth-

erwise touted his experience and his ability to recognize a "lucrative investment model." Drawing on his experience, he stated he had introduced many of his existing clients to the highly profitable investment methodology of his good friend, Altholtz. Yet, at the time the letter was written, Gay's license was suspended and he was under a permanent injunction not to associate with any issuer or promoter of securities. Under the circumstances, the nondisclosure of Gay's license revocation and permanent injunction should have been disclosed in order to correct an otherwise misleading impression of his status and ability to recommend investments.

For similar reasons, we conclude that evidence in the record supports the Commissioner's determination that the information not disclosed was material. Our supreme court has construed the term "materiality," for purposes of section 11–51–501(1), as follows: "A misrepresented or omitted fact is considered material ... if there is a substantial likelihood that a reasonable investor would consider the matter important in making an investment decision." *Goss v. Clutch Exchange, Inc.*, 701 P.2d 33, 36 (Colo.1985). "Whether or not the misrepresented or omitted fact is important turns on whether a reasonable investor would regard it as significantly altering the 'total mix' of information made available." *Id.* (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

A division of this court has specifically held that evidence of NASD sanctions constituted "the kind of information a reasonable investor would consider in making an investment." *Prendergast*, 87 P.3d at 184. Here, too, the NASD sanction, the loss of Gay's investment license, and certainly the fact that he was permanently enjoined from associating with any issuer, could reasonably have been found by the Commissioner to be part of the total mix of information that a reasonable investor would consider in making an investment. Indeed, the materiality of these events was apparent to Altholtz, for he testified that when he learned of Gay's license revocation, he consulted with his own lawyer as to the ramifications, and when he learned of the permanent injunction, he terminated Gay's

employment. He further testified that had he known of the injunction prohibiting Gay from associating with any issuer in Colorado, he would not have conducted the November seminar with Gay's participation and "risk[ed][his] entire business."

Respondents' not knowing specifically of the injunction prohibiting Gay's association with any issuer in Colorado did not justify their omission of that material fact, for respondents were on notice since at least May 2007 of his licensing problems with the Commission and had a duty to investigate and discover the status of the problems, particularly since, as they argue in the following subsection, the information they claim not to have known was of public record. Closing one's eyes to the true facts does not justify an omission of material facts.

### 3. Public Information

■ Respondents finally contend that they had no need to disclose Gay's licensure status because it was public information. We are not persuaded.

The Supreme Court has recognized that the purpose of securities regulations is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). This philosophy also is reflected in the CSA, which places the burden of not making untrue statements of material fact, and not omitting to state material facts, on any person connected with the offer, sale, or purchase of any security. § 11–51–501(1)(b); *Western–Realco,* 791 P.2d at 1144 ("The design of the [CSA] is to protect investors by promoting full disclosure."). We are unaware of any authority which recognizes an exception to the CSA's disclosure requirements for publicly available information.

### D. Severity of Sanctions Imposed

■ Section 11–51–606(1.5)(d)(IV) provides that if the Commissioner

reasonably finds that the person against whom the order to show cause was entered

has engaged, or is about to engage, in acts or practices constituting violations ... and makes the findings required by section 11–51–704(2), he or she may issue a final cease-and-desist order imposing one or more of the following sanctions:

(A) Directing such person cease and desist from further unlawful acts or practices....

Section 11–51–704(2), C.R.S.2008, in turn, requires that no order be made unless it is appropriate in the public interest.

The Commissioner ordered that respondents cease and desist from "committing or causing any violations" of sections 11–51–301, –401, and –501, or "otherwise engaging in conduct in violation of any provision" of the CSA. The Commissioner did not prevent BDF from continuing to sell its securities, limit the manner in which it could continue to sell them, or order it to take any remedial measures. Essentially, the Commissioner ordered respondents to comply with Colorado law.

Respondents contend that the sanction is arbitrary and capricious because the Commissioner did not identify what factors he used in determining whether the sanction was in the public interest. It is self-evident that the sanction here, an order to cease further violations of the CSA, is predicated on the conclusion that violations of the CSA had occurred. Compliance with the CSA is necessarily in the public interest. The passage of such laws by the legislature establishes the public interest underlying such provisions. Here, we see no need for a specific finding by the Commissioner detailing why ordering respondents to cease and desist from violating the CSA is in the public interest. We also find nothing arbitrary or capricious in the terms of a cease and desist order that mandates compliance with those laws.

The order is affirmed except that the finding by the Commissioner that respondents sold securities "in a fraudulent manner" is reversed, and the case is remanded for correction of that aspect of the final order.

Judge FURMAN and Judge NEY* concur.