2013 COA 89

**MOYE WHITE LLP, a Colorado limited liability partnership, Plaintiff–Appellee,**

v.

**David I. BEREN, Defendant–Appellant.**

**Nos. 12CA0954 & 12CA1611**

Colorado Court of Appeals, Div. I.

Announced June 6, 2013

Rehearing Denied Aug. 1, 2013

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2012.

374

Wheeler Trigg O'Donnell, P.C., Carolyn J. Fairless, David J. Schaller, Kendra N. Beckwith, Denver, Colorado, for Plaintiff–Appellee

Spencer Fane & Grimshaw, LLP, Stuart H. Pack, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE TAUBMAN

¶ 1 Defendant, David I. Beren, appeals the trial court's judgment and order of costs in favor of plaintiff, Moye White LLP, denying, as relevant here, Beren's counterclaim for breach of fiduciary duty. In addressing an issue of first impression, we conclude that a law firm does not have a fiduciary duty to disclose information about the medical and arrest history of one of its attorneys that "might impair" the quality of the law firm's representation, but does not actually impair its quality. We affirm.

## I. Background

¶ 2 Moye White brought this suit against Beren for recovery of attorney fees incurred during its representation of Beren in a probate matter from 2009 to 2010.[1] As part of the suit, Moye White sought $229,118.10 from Beren on a breach of contract claim. Beren counterclaimed against Moye White, claiming, among other things, that it breached its fiduciary duty to him by failing to disclose and intentionally concealing material information related to one of the attorneys working on his case, Attorney A,[2] who had a history of disciplinary proceedings, mental illness, alcoholism, and related arrests.

¶ 3 Following a trial to the court, the trial court issued a well-reasoned order finding in favor of Moye White on all claims. The trial court concluded that Moye White did not breach its fiduciary duty to Beren, because no legal or ethical duty existed to disclose information about Attorney A's history of mental illness, alcoholism, and a stayed suspension to practice law absent evidence that it materially affected his performance as an attorney.

¶ 4 As the prevailing party in the trial court, Moye White moved for an award of costs totaling $76,637.49. The trial court granted the motion in part, awarding Moye White $69,975.59.

¶ 5 Beren appealed separately the trial court's judgment and a portion of the award of costs. The appeals were consolidated, and this appeal followed.

## II. Existence of a Duty

¶ 6 Beren asserts that the trial court erred by concluding that no duty existed for Moye White to disclose Attorney A's medical and arrest history, because such a duty exists under the common law and Colo. RPC 1.4 and 7.1. We disagree.

1. Another division of this court recently addressed the merits of the underlying probate case in *In re Estate of Beren*, 2012 COA 203, —— P.3d ——, 2012 WL 5871034.

2. Both parties use the pseudonym "Attorney A" to protect the attorney's identity. Accordingly, we do the same in this opinion.

¶ 7 Beren does not cite cases in Colorado or other jurisdictions directly on point, nor are we aware of any.[3] Nevertheless, the parties cite cases involving other professionals' fiduciary duty to disclose material information to a principal. After considering those cases, we hold that Moye White did not have a fiduciary duty to disclose Attorney A's medical and arrest history because it did not pose a demonstrable risk to the firm's ability to represent Beren.

## A. Relevant Facts

¶ 8 The trial court made the following factual findings, which are not challenged on appeal:

¶ 9 Beren hired Moye White after several discussions regarding his probate case with Eric Liebman, a partner at the firm. During these discussions, Liebman informed Beren that, if hired, he would act as the principal litigator on the case, with assistance from John Moye and Marilyn McWilliams. During these discussions, Beren placed no limitations on how many or which lawyers at Moye White would assist in his case.

¶ 10 In May 2009, Beren executed a retainer agreement with Moye White (the Agreement). The Agreement specified that although Liebman would "have supervisory responsibility ... [Moye White would] draw upon the abilities of various members of [the] Firm as necessary or appropriate to handle [Beren's] matters efficiently and effectively."

¶ 11 In November 2009, Moye White decided to bring another partner, Attorney A, onto the case for added experience and assistance. Accordingly, Liebman sent an e-mail to Beren on November 9, 2009, which stated:

I am sure you have noticed by now that I have recruited my partner [Attorney A] onto the Moye White team representing you. [Attorney A] is a probate litigator like myself, but I will make sure there is no duplication among us. I just want to make sure we have top-notch coverage when matters arise and I am in trial, like last week.

[Attorney A's] pedigree is outstanding, and I have no question you will enjoy both [his] personality and enviable intellect. [He] is a 20–year lawyer, a graduate of [an East Coast law school], and a former partner of [an elite firm].

[Attorney A] has already added substantial value with some ideas for appeal [he] has originated, and of which we will be apprising you and the team shortly. I look forward to introducing you to [him] by telephone in the near future.

Beren did not respond to the e-mail.

¶ 12 Attorney A suffered from clinical depression, other medical issues, marital problems, and alcoholism starting in 2007. In 2008, he pleaded guilty to a charge of driving while ability impaired. Despite undergoing intensive outpatient alcohol treatment, he relapsed in 2008. In December 2008, police arrested him on a domestic violence charge. Following the arrest, he entered intensive inpatient alcohol treatment. In March 2009, he returned to work at Moye White after his treating physician and psychologist certified that he was mentally and emotionally fit to practice law.

¶ 13 Attorney A self-reported the above information to the Office of Attorney Regulation Counsel (OARC), which conducted a full investigation. At the conclusion of the inves-

---

3. Moye White relies on *Albany Urology Clinic, P.C. v. Cleveland,*272 Ga. 296, 528 S.E.2d 777 (2000). There, the Georgia Supreme Court considered whether a doctor had a duty to disclose personal drug use to a patient when no evidence existed that the doctor used drugs at work or that drugs affected his performance as a doctor. The court granted certiorari to determine "[w]hether there exists a duty arising from all professional relationships to disclose any factor or factors of the professional's life which might adversely affect the professional's performance," and held "that absent inquiry by a patient or client, there is neither a common law nor a statutory duty on the part of either physicians or other professionals to disclose to their patients or clients unspecified life factors which might be subjectively considered to adversely affect the professional's performance." *Id.* at 778. While the above-quoted language supports our conclusion, the *Albany Urology* court addressed a fraud claim and did not discuss fiduciary duty. *Id.* at 779–80. Further, although the holding refers to all professionals, the court limited its analysis to Georgia common law and statutory rules governing informed consent between patients and doctors. *Id.* Accordingly, we conclude that *Albany Urology* is of limited application here.

tigation, Attorney A's license to practice law in Colorado was suspended, with a complete stay of the suspension conditioned on his receiving ongoing substance abuse treatment. Under a stipulation with the OARC, Attorney A was placed on a monitoring program that tested him for alcohol consumption. On three occasions, between March and June 2010, Attorney A tested positive for alcohol consumption. Although he admitted to consuming alcohol on those occasions, he denied relapsing. From June 2010 until the date of the trial court's order, Attorney A remained sober. Attorney A did not report the three positive tests to Moye White, but admitted at trial that he should have done so.

¶ 14 Moye White was aware of Attorney A's medical and substance abuse issues, arrests, and stayed suspension. The firm worked closely with Attorney A to monitor his progress and treatment. Before Attorney A was allowed to return to work, Moye White consulted with his treating psychologist, and instituted a supervision plan under which his legal work would be reviewed by another attorney.

¶ 15 In a routine annual performance review of Attorney A's work for Moye White, other attorneys at the firm described his work as "excellent," and the attorney monitoring his work product never reported any issues. In August 2009, the firm received a follow-up report from Attorney A's treating psychologist, which stated that he continued to do well in therapy, was emotionally stable, and was having no problems.

¶ 16 Moye White never advised Beren regarding Attorney A's medical and arrest history, and his stayed suspension. Beren remained unaware of Attorney A's medical and arrest history until after Moye White moved to withdraw from representing him in July 2010. However, the information was part of the public record. Beren became aware of the above facts in January 2012, after conducting "his own research."

¶ 17 At trial, Beren asserted that, had he known about Attorney A's medical and arrest history at the time Attorney A was brought onto the case, he would have objected to Attorney A's representation. He therefore argued that Moye White's failure to disclose

the above information constituted a breach of its fiduciary duty to him. He also asserted that Liebman's November 9, 2009 e-mail constituted a breach of fiduciary duty, because it omitted material information regarding Attorney A's medical and arrest history.

¶ 18 However, the trial court found that Beren's testimony lacked credibility, and that his objection to Attorney A was an "after-the-fact justification" for his refusal to pay Moye White. The trial court also found that no evidence supported Beren's contention that the above circumstances affected Attorney A's abilities as a lawyer, the outcome of Beren's probate matter, or the fees charged by Moye White.

### B. Standard of Review

¶ 19 We review de novo whether a fiduciary relationship gives rise to a fiduciary duty. *Mintz v. Accident & Injury Med. Specialists, PC*, 284 P.3d 62, 68 (Colo.App.2010), *aff'd*, 2012 CO 50, 279 P.3d 658. "We also review de novo the legal questions concerning the fiduciary duty's nature and scope...." *Id.*

### C. Discussion

¶ 20 A fiduciary relationship exists as a matter of law between an attorney and his or her client. *See Moguls of Aspen, Inc. v. Faegre & Benson*, 956 P.2d 618, 621 (Colo. App.1997) (citing *Calhoun v. Rane*, 234 Ill. App.3d 90, 175 Ill.Dec. 304, 599 N.E.2d 1318, 1321 (1992)). However, whether the attorney is under a fiduciary duty to act in a certain manner depends on the individual circumstances of the relationship. *See Steiger v. Burroughs*, 878 P.2d 131, 134 (Colo.App. 1994).

¶ 21 To prevail on a claim of breach of fiduciary duty against an attorney, a plaintiff must establish that a particular standard of care existed and that the attorney failed to adhere to that standard. *Ehrlich Feedlot, Inc. v. Oldenburg*, 140 P.3d 265, 271 (Colo. App.2006).

¶ 22 Here, Beren asserts that the common law and Colo. RPC 1.4 and 7.1 establish a standard of care requiring an attorney to disclose information related to his or her

medical and arrest history,[4] when any such history has a possibility of interfering with the representation. We disagree.

### 1. Common Law

¶ 23 Beren contends the trial court erred in concluding that the common law imposed no fiduciary duty on Moye White to disclose Attorney A's medical and arrest history. We disagree.

¶ 24 Under Colorado common law, a fiduciary has the duty to disclose only "material" information. *See Olsen v. Vail Assocs. Real Estate, Inc.,* 935 P.2d 975, 978 (Colo. 1997); *Wisehart v. Zions Bancorporation,* 49 P.3d 1200, 1205 (Colo.App.2002); *see also* Vincent R. Johnson & Shawn M. Lovorn, *Misrepresentation by Lawyers About Credentials or Experience,* 57 Okla. L.Rev. 529, 544 (2004) ("A fiduciary never has a duty to reveal immaterial information...."). In the context of a real estate broker's fiduciary duty to his or her client, information is "material" when a reasonable person would have ascribed actual significance to the information. *See Olsen,* 935 P.2d at 978 (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also* Johnson & Lovorn, 57 Okla. L.Rev. at 539 n.36 (discussing materiality in the context of an attorney as a fiduciary). Similarly, in the context of a director's duty to shareholders, "[i]nformation is material if 'considering the specific factual circumstances involved, [the information] would have assumed actual significance in the deliberations of a reasonable shareholder or would have been considered by a reasonable investor as having significantly altered the total mix of the available information.'" *Wisehart,* 49 P.3d at 1205 (quoting *Thorne v. Bauder,* 981 P.2d 662, 665 (Colo.App.1998)). Further, when considering whether information regarding a potential risk is material, courts may consider the "probability that the [risk] will occur and the anticipated magnitude of the [risk]." *Id.* (quoting *Basic, Inc.*

*v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

¶ 25 Beren cites Johnson & Lovorn, 57 Okla. L.Rev. at 539, for the assertion that a subjective test for materiality applies under which courts should examine whether information would be considered material to Beren personally, as opposed to a "reasonable" client. However, when read it its entirety, the article supports the conclusion that an objective "reasonable person" test applies to determinations of materiality. *See id.* at 539 n.36. Beren cites no other authority to support a purely subjective test, nor are we aware of any.

¶ 26 Here, Beren asserts that Attorney A's medical and arrest history was material information because it negatively affected the quality of Moye White's representation. Therefore, he asserts, Moye White's failure to disclose Attorney A's medical and arrest history constituted a breach of its fiduciary duty. However, we conclude that the information was not material, because the evidence presented at trial demonstrated that Attorney A's medical and arrest history did not adversely affect the quality of Moye White's representation. Thus, we conclude that any risk was speculative.

¶ 27 The trial court's undisputed factual findings demonstrated that Moye White established numerous procedures to monitor the effect of Attorney A's alcoholism and other medical issues, and to ensure that his work product did not suffer. The trial court also found that numerous medical professionals had certified Attorney A. fit to practice law. Most importantly, the trial court found that at no point during the representation was Attorney A "materially impaired." We also ascribe significance to the OARC's decision to stay Attorney A's suspension, which evidences its confidence in his ability to practice law competently. Thus, only a speculative risk existed that Attorney A's medical and arrest history might impair Beren's representation. Even a reasonably prudent person, concerned about the quality of his or her

---

4. Beren acknowledges that C.R.C.P. 251.28(b) and (c) expressly provide that a lawyer is not required to disclose to his or her clients a fully stayed suspension resulting from a disciplinary proceeding. Nevertheless, he asserts that principles of fiduciary duty create such an obligation under the facts presented here.

legal representation, would not find such a speculative risk significant in his or her decision to retain a particular law firm.[5] Thus, the information regarding Attorney A's medical and arrest history was not material.

¶ 28 We also find it significant that Attorney A's disciplinary records were publicly available. If Beren believed that an attorney's disciplinary record was dispositive in hiring that attorney, he could have independently researched Attorney A's disciplinary record following the November 9, 2009 e-mail, or he could have sought the inclusion of a provision in his retainer agreement that Moye White would be required to disclose to him any disciplinary action against any of his attorneys.[6] *See generally Stone v. State Farm Mut. Auto. Ins. Co.*, 185 P.3d 150, 159 (Colo.2008) (when determining whether a party has a compelling need for requested discovery information, a court may consider whether the information is available through sources other than the opposing party); *but see Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 738 (Colo.App.2009) (respondents should have disclosed the license revocation of and permanent injunction against its employee, even though the license revocation information was publicly available). While the public availability of the records is not dispositive of our analysis, it militates against a finding of materiality.

¶ 29 Accordingly, because Attorney A's medical and arrest history was not material, Colorado common law placed no fiduciary duty on Moye White to disclose the information.

2. Rules of Professional Conduct

¶ 30 Beren contends the trial court erred in concluding that the Colorado Rules of Professional Conduct imposed no fiduciary duty on Moye White to disclose Attorney A's medical and arrest history. We disagree.

¶ 31 The Colorado Rules of Professional Conduct "are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." Colo. RPC preamble, ¶ 20. Thus, "[v]iolation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached." *Id.* Nor are the rules "designed to be a basis for civil liability." *Id.* "Nevertheless, since the Rules do establish standards of conduct by lawyers, in appropriate cases, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct." *Id.*

¶ 32 Accordingly, although the rules do not create a fiduciary duty, they may evidence standards of care. Thus, we may look to the rules to determine whether an attorney failed to adhere to a particular standard of care, and thus, breached his or her fiduciary duty to a client.[7]

a. Rule 1.4

¶ 33 Colo. RPC 1.4(1)(a) and (b) provide that "[a] lawyer shall ... promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules" and "shall explain a matter to the extent reasonably

---

**5.** The trial court aptly recognized this point in its order:

> If "might impair" was the standard, then *any* event (be it a medical condition; a separation/divorce; serious illness or death of a parent or partner or spouse or close friend; too much work; too little work; stress; financial concerns; etc.) which *could* affect a lawyer's work would have to be disclosed and "informed consent" would have to be given by the client for each such "could have" event. This is not required under either the law or common sense.

(Emphasis in original.)

**6.** The availability of Attorney A's disciplinary records, however, is not dispositive to our analysis.

Certainly, under some circumstances, an attorney would be under an obligation to inform his or her clients about certain disciplinary actions, regardless of whether those actions were publicly available information.

**7.** We note that the Rules of Professional Conduct apply to conduct by lawyers, not law firms. *See* Colo. RPC Preamble [12] ("Every lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers."). Nevertheless, we address Moye White's contentions that the Rules of Professional Conduct imposed a fiduciary duty on Moye White as a law firm.

necessary to permit the client to make informed decisions regarding the representation." Informed consent occurs when a person agrees to a proposed course of conduct after an attorney has adequately explained the material information regarding the risks of and reasonably available alternatives to a proposed course of conduct. Colo. RPC 1.0(e). Thus, Rule 1.4 requires, in part, that a lawyer inform a client of material information related to matters where informed consent is required. The rules require informed consent in only a limited set of circumstances. *See, e.g.,* Colo. RPC 1.2(c) (limited representation); Colo. RPC 1.6 (waiver of confidentiality); Colo. RPC 1.7–1.10 (waiver of conflict of interest).

¶ 34 We conclude, however, that Rule 1.4 is inapposite to the situation presented here. Rule 1.4 relates to disclosure of information necessary for a client to give informed consent. Here, Beren provides no authority requiring a client's informed consent before a law firm can allow an additional attorney to work on a case, nor are we aware of any. Further, Beren agreed to allow Moye White to "draw upon the abilities of various members of [the] Firm as necessary or appropriate to handle [his] matters efficiently and effectively." In doing so, he effectively delegated the decision of who could work on his case to Moye White. Accordingly, under the Agreement, his informed consent was expressly not required. Therefore, Rule 1.4 does not evidence a standard of care that would require disclosure of such information under the facts presented here.

¶ 35 Even if Beren's informed consent were required, Rule 1.4 does not apply here because, as discussed above, information regarding Attorney A's medical and arrest history was not material to Moye White's representation of Beren. Thus, we hold that Colo. RPC 1.4 is inapposite and does not evidence the existence of a fiduciary duty to disclose nonmaterial information to a client.

#### b. Colo. RPC 7.1

¶ 36 Colo. RPC 7.1(a)(1) provides in relevant part, "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it . . . omits a fact necessary to make the statement considered as a whole not materially misleading. . . ."

¶ 37 Here, Beren asserts that Rule 7.1 evidences a standard of care prohibiting an attorney from making material omissions in his or her communications with a client. We conclude, however, that the rule is inapposite. When read in its entirety, Rule 7.1 governs attorneys' advertisements of legal services. The rule's location within the Rules of Professional Conduct supports this conclusion. Rules 7.1 to 7.6 govern "information about legal services" and concern advertisements, Colo. RPC 7.2; direct contact with prospective clients, Colo. RPC 7.3; and law firm names and letterheads, Colo. RPC 7.5. *See also* H. Patrick Furman & Daniel A. Vigil, *Colorado Rules of Professional Conduct: Implications for Criminal Lawyers,* 21 Colo. Law. 2559, 2563–64 (Dec.1992). In contrast, Rules 1.1 to 1.18 govern the "client-lawyer relationship." Accordingly, we conclude that Rule 7.1 does not relate to the November 9, 2009 e-mail, because it did not constitute an advertisement of legal services, but instead, was a communication with an existing client.

¶ 38 Even if Rule 7.1 were applicable, we would conclude that it did not evidence a standard of care for Moye White to reveal Attorney A's medical and arrest history in the November 9, 2009 e-mail. As discussed above, Attorney A's medical and arrest history was not material to Moye White's representation of Beren. Accordingly, the omission of the information was not materially misleading under Rule 7.1.

### III. Costs

¶ 39 Beren asserts that the trial court abused its discretion by awarding costs to Moye White for scanning documents and employing a private court reporter. We disagree.

#### A. Standard of Review

¶ 40 The decision whether to grant an award of costs to a prevailing party is within the discretion of the trial court. *Cf.*

*Gaming Corp. v. Taylor,* 205 P.3d 523, 526 (Colo.App.2009). Therefore, we will not disturb the trial court's ruling absent a showing of an abuse of discretion. *Id.*

### B. Scanning Costs

¶ 41 A prevailing defendant may recover the reasonable and necessary costs it incurred in the course of litigation. § 13–16–105, C.R.S.2012. Section 13–16–122(1)(f), C.R.S.2012, provides that "[a]ny fees for exemplification and copies of papers necessarily obtained for use in the case" are recoverable as costs.

¶ 42 Here, Moye White was awarded $3,687.19 for the cost of scanning documents into document management software. Moye White explained to the trial court that the costs were necessary because the content scanned was voluminous (28,363 pages), and the document management software allowed for more efficient trial preparation. Additionally, Moye White submitted evidence demonstrating that Beren's counsel requested that the documents be delivered to him in a scanned format as part of discovery.

¶ 43 Beren asserts that the scanning was not necessary because the scanned documents were not used at trial. However, costs for trial preparation may be considered necessary and are awardable. *Catlin v. Tormey Bewley Corp.,* 219 P.3d 407, 412 (Colo. App.2009). Whether a claimed expense was for goods or services used at trial is not dispositive. *See id.* at 413 ("In certain circumstances, a trial court may award costs for an expert witness who does not testify.").

¶ 44 Because the scanning assisted Moye White in efficiently preparing for trial and responding to Beren's discovery requests, we conclude that the trial court did not abuse its discretion by determining that the costs were necessary and awardable.

### C. Court Reporter Costs

¶ 45 Section 13–17–202(1)(a)(II), C.R.S.2012, provides:

> Notwithstanding any other statute to the contrary, ... [i]f the defendant serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the plaintiff, and the plaintiff does not recover a final judgment in excess of the amount offered, then the defendant shall be awarded actual costs accruing after the offer of settlement to be paid by the plaintiff.

"The trial court has no discretion to deny an award of actual costs under this statute, so long as it determines that those costs are reasonable." *Catlin,* 219 P.3d at 415 (quoting *Bennett v. Hickman,* 992 P.2d 670, 673 (Colo.App.1999)).

¶ 46 Section 13–17–202(1)(b) defines actual costs as "costs actually paid or owed by the party, or his or her attorneys or agents, in connection with the case, including but not limited to ... court reporter fees."

¶ 47 Here, Moye White made a pretrial offer of settlement in December 2011. The costs of the court reporter were incurred following the offer of settlement. Accordingly, under section 13–17–202, the trial court was required to award the court reporter fees, so long as they were reasonable.

¶ 48 On appeal, Beren does not assert that the court reporter fees were unreasonable.[8] Accordingly, the trial court did not abuse its discretion in awarding the court reporter costs.

¶ 49 The judgment and order are affirmed.

Román and Sternberg *, JJ., concur

---

8. Rather, Beren asserts that *Valentine v. Mountain States Mut. Cas. Co.,* 252 P.3d 1182, 1192 (Colo.App.2011), prohibits the trial court from awarding costs where the parties agreed during litigation to split the costs. We conclude, however, that *Valentine* is distinguishable, because the relevant portion of the case involved costs awarded pursuant to section 13–16–122 rather than section 13–17–202. *Id.* Specifically, because section 13–17–202 provides that all actual costs after an offer of settlement has been made are recoverable, Beren was on notice that the costs of the court reporter were recoverable.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2012.