## No. C-925

**Bernard L. Lowery, Sr. and Joanne M. Lowery v. Ford Hill Investment Co., a partnership, and Wynn D. Crew, as general partner and individually**

(556 P.2d 1201)

Decided November 15, 1976. Rehearing denied December 20, 1976.

Stitt, Wittenbrink and Roan, P.C., R. J. Wittenbrink, for petitioners.

Wynn D. Crew, pro se and for Ford Hill Investment Company.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

We granted certiorari to review the decision of the court of appeals in *Lowery v. Ford Hill Investment Co.*, 37 Colo. App. 260, 548 P.2d 127 (1976). We reverse the court of appeals and remand with directions to grant the relief mandated by the Colorado Securities Act.

Bernard L. Lowery, Sr. and Joanne M. Lowery filed a civil action to rescind an installment sales contract which they entered into with the Ford Hill Investment Company (hereinafter Ford Hill), for the purchase of a condominium at Breckenridge, Colorado. The basis for rescission was that the contract of sale constituted a security and that the sale was in violation of the Colorado Securities Act. Admittedly, Ford Hill did not file a registration statement in accordance with the requirements of the Colorado Securities Act. Section 11-51-101, *et seq.*, C.R.S. 1973. As an alternative basis for recovery, the plaintiffs asserted that even if the sales transaction was exempt from registration under the Securities Act, the defendants were liable for misrepresentation. Thus, the issues are: (1) Did the installment sales contract constitute a security? (2) Was the sale exempt from registration? (3) Were the defendants guilty of actionable

misrepresentation?

The trial court, at the conclusion of the trial, entered alternative findings and held that:

(1) The sale of the condominium did not involve a security;

(2) Even if a security was involved, the transaction was exempt as a private offering; and

(3) Even if a security was involved, the plaintiffs failed to prove that the defendants made a material misrepresentation of fact, or that the defendants omitted to state material facts.

In affirming the trial court, the court of appeals concluded that while the contract constituted a security, the offering was a private offering and, therefore, exempt from registration requirements. In addition, the court of appeals concluded that no material misrepresentations of fact was shown by the plaintiffs.

I.

The Facts

Ford Hill Investment Company is a partnership. Wynn D. Crew is the managing partner. Ford Hill built a six-unit condominium in Breckenridge, Colorado, and on August 21, 1971, listed the units in the condominium for sale with a broker, pursuant to an exclusive right to sell agreement.

In early 1973, the plaintiffs had access to funds which they intended to invest. They learned that their friends, the Crews, were selling condominium units in Breckenridge, Colorado. After some negotiations, Wynn D. Crew obtained a release of one condominium unit from the broker, and the plaintiffs and the defendant Ford Hill executed an installment sales contract. Tied to this sales contract was a mandatory exclusive management and rental agreement which was common to each unit for sale. It contained the following elements:

(1) Ford Hill Investment Company was the exclusive management and rental agent for each condominium owner for at least five years. As such, Ford Hill was to use "best efforts" in "a manner fair to all owners" to rent the units at all feasible times.

(2) Owners of each condominium unit were required to give up to six months' advance notice, in writing, if they were to reserve the right to occupy their condominium unit for personal use.

(3) The condominium owners were "responsible for furnishing and maintaining the individual unit in a rentable, first-class manner and condition, complete with furniture, furnishings, and appliances."

(4) The duties of the manager included: (a) necessary promotion, with funds obtained by a monthly promotion charge, "so as to provide the longest number of rental days possible"; (b) arrange for trade association memberships and promotional materials; and (c) hire, pay, supervise, and discharge the necessary personnel and contract labor to properly manage,

maintain, and operate the condominium and rental of the units during the entire twelve-month calendar period at a reasonable cost to the owners.

(5) In addition to the monthly rental promotion fee, each owner was to be assessed a "rental management fee paid out of gross rentals."

(6) Rental rates were to be determined and fixed solely by the manager.

(7) For promotional purposes the manager was to have the use of each individual unit during the off-season for a maximum of three days in each twelve-month period.

(8) Ford Hill was the exclusive agent for each owner in securing rental supporting services such as heating, maid service, liability insurance, firewood, and repairs and maintenance.

(9) The mandatory arrangement was terminable only by mutual consent or by a two-thirds vote of all individual unit owners. Voting had to be personal and in writing. No proxies were allowed. If not terminated in accordance with the contract, prior to February 1, 1977, the agreement was to be automatically renewed for an additional six-year period.

Ford Hill provided the broker with a brochure which stated: "For convenient mountain living with a potential for income producing, lease-rent arrangements, this plan is unequalled." Each "basic unit" could be divided into two independent units "with the same potential for subrenting as described above."

The broker advertised the condominiums for sale in the newspapers. Undisputed testimony established that the plaintiffs visited Breckenridge to view the unit which was ultimately purchased and that the plaintiffs were informed by the defendant that the units were being rented to skiers for three to four nights a month at $60 per night. The plaintiffs testified that the defendant's management rental agent informed them that the rental units were nationally advertised. The evidence was conflicting, but the trial court concluded that the defendant made a "full disclosure" of what he thought the future would bring for this condominium. The trial court's findings do not indicate what "full disclosure" consisted of, but the record reveals that Wynn D. Crew, when asked by the plaintiffs for information regarding the future profits of the condominium, declined to speculate and warned them not to undertake the purchase for profit, specifically stating that the rental level achieved to date in the area was ninety days per year.

Finally, the trial court found that the plaintiffs' purpose in purchasing the unit was two-fold: primarily for an investment purpose and secondarily "for the recreation of the [plaintiffs'] family."

II.

The Condominium Contract as a Security

While this court is not bound by federal law in the interpretation of the Colorado Securities Act, we find that insofar as the provisions and purposes of our statute parallel those of the federal enactments, such

federal authorities are highly persuasive. *See, e.g., Saur v. Hayes*, 36 Colo.App. 190, 539 P.2d 1343 (1975); *Cf. Mr. Steak, Inc. v. River City Steak, Inc.*, 324 F.Supp. 640 (D. Colo. 1970), *aff'd* 460 F.2d 666 (10th Cir. 1972).

■ The statutory definitions of the term "security" under section 11-51-102(12), C.R.S. 1973, and 15 U.S.C. § 77b(1) (1970) (commonly referred to as the Securities Act of 1933) are virtually identical. Each includes "evidence of indebtedness . . . participation in any profit-sharing agreement . . . investment contract . . . or, in general, any interest or instrument commonly known as a 'security.'" Such expansive language in the Colorado statute indicates a legislative intent to provide the flexibility needed to regulate the various schemes devised by those who seek the use of the money of others with the lure of profits. *See SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *Saur v. Hayes, supra.*

■ The hallmark of state and federal securities regulation has always been close attention to the facts of each case and a substantive appraisal of the commercial realities of the offering. *See, e.g., SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); 1 *L. Loss, Securities Regulation* 493 (2d ed. 1961).

■ The classic articulation of what constitutes an "investment contract" under federal securities law was stated in *SEC v. W. J. Howey Co., supra:*

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . ."[1]

■ The elements of the *Howey* formula are present in this case. The plaintiffs invested money under a contract of sale. The fact that the

---

[1] This generic definition was recently restated by the Supreme Court in these words: "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepeneurial or managerial efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Some states, in interpreting their own statutes, have rejected the *Howey* test as overly restrictive and mechanical. *See, e.g., Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 361 P.2d 906, 13 Cal.Rptr. 186 (1961) (Traynor, J.); *State v. Hawaii Market Center, Inc.*, 52 Hawaii 642, 485 P.2d 105 (1971); *State ex rel. Healey v. Consumer Business Systems, Inc.*, 5 Ore. App. 19, 482 P.2d 549 (1971). While cognizant of these broader definitions, we find that the instant case does not require us to test the boundaries of the *Howey* formula. *Compare Saur v. Hayes*, 36 Colo. App. 190, 539 P.2d 1343 (1975); *Venture Inv. Co. v. Schaefer*, CCH Fed. Sec. L. Rep. 71,031 (D. Colo. Civ. No. C-2732, June 16, 1972) (applying "risk capital" analysis to Colorado law), *aff'd on other grounds*, 478 F.2d 156 (10th Cir. 1973).

rental agreement imposed by Ford Hill was mandatory and exclusive as to all purchasers, and that the rental rate, supporting services, and promotion and allocation of renters were all controlled by a common agent makes this venture a "common enterprise" within the meaning of the *Howey* formula. *See, e.g., McCown v. Heidler*, 527 F.2d 204 (10th Cir. 1975); *Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967), *cert. denied*, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968). Despite the finding by the trial court of a "secondary" purpose of personal recreational use, this subordinate motive for the purchase does not sufficiently eclipse the plaintiffs' primary purpose of an "expectation of profit." *Compare SEC v. W. J. Howey Co., supra* (found to be a security because the investor was "attracted solely by the prospects of a return"), *with United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (security absent because "purchasers were interested in acquiring housing rather than making an investment for profit"). *See also*, Note, *Federal Securities Regulation of Condominiums: A Purchaser's Perspective*, 62 Geo. L. J. 1403 (1974).

While this juxtaposition of purposes clearly presents a "difficult question," *United Housing Foundation, Inc. v. Forman, supra*, our assessment of the impact of the dual purposes is predicated upon the nature of the contract. In this case (1) personal use of the unit had to be reserved up to six months in advance, (2) the owner had to maintain his unit in a "rentable" condition, and (3) the owner had to agree to pay a flat monthly charge to finance promotional activities by a manager. The personal uses envisioned by the purchasers are dimmed by these requirements imposed by Ford Hill and cause the investment purpose to pervade the transaction. Finally, we perceive no factor in this case which would remove it from the category where the purchaser "is led to expect profits *solely* from the efforts of the promoter or a third party."[2] *SEC v. W. J. Howey Co., supra*.

█ Both the trial judge and Judge Smith, specially concurring in the court of appeals' decision, *Lowery v. Ford Hill Investment Co., supra*, indicated that the legislature did not intend to include condominium sales within the scope of securities. We find no evidence upon which to base such a determination, and we are persuaded that the sale of condominium property, when accompanied by collateral agreements of the type used in this case, does constitute the sale of a "security" within the meaning of the

---

[2] In *Saur v. Hayes*, 36 Colo.App. 190, 539 P.2d 1343 (1975), the Colorado Court of Appeals adopted the majority construction of this phrase in *Howey*, which was developed in *SEC v. Glen Turner Enterprises, Inc.*, 348 F. Supp. 766 (D. Ore.), *aff'd*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973) (requisite expected efforts of promoter "are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.").

Colorado statute. As the Supreme Court said in *SEC v. C. M. Joiner Leasing Corp., supra*:

"It is argued that the definition of 'security' which controls the scope of this Act falls short of including these transactions.

. . . .

"In the Securities Act the term 'security' was defined to include by name or description many documents in which there is common trading for speculation and investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning. Others are of more variable character and were necessarily designated by more descriptive names, such as 'transferable share,' 'investment contract,' and 'in general any interest or instrument commonly known as a security.' We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents."

■ Accordingly, we find that section 11-51-102(12), C.R.S. 1973, encompasses this transaction.[3]

### III.
### Public Offering

The court of appeals concluded that the sale of the securities in this case was exempt from registration because it did not involve a "public offering" under section 11-51-114(2)(i), C.R.S. 1973. *See Lowery v. Ford Hill Inv. Co.*, 37 Colo. App. 260, 548 P.2d 127 (1976).

The statute defines the phrase "not involving any public offering" as ". . . any offering where the seller reasonably believes that the securities purchased are taken for investment and not with a view toward sale or re-

---

[3] Our application of the *Howey* test to the subject of condominium offers is further guided by recent pronouncements of the Securities and Exchange Commission. As a general rule, the mere offer and sale of condominium property does not constitute a security transaction under federal law. *See, e.g.*, SEC No-Action Letter, *In re Surftides Condominiums, Inc.* (Feb. 7, 1972), CCH Fed. Sec. L. Rep. 78,686. However, when coupled with certain collateral agreements, such offerings may involve a security. These include offerings where:

"1. The condominiums, with any rental arrangement or other similar service, are offered and sold *with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter*, or a third party designated or arranged for by the promoter, from rental of the units.

2. The offering of participation in a rental pool arrangement; and

3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, and *must use an exclusive rental agent, or is otherwise materially restricted in his occupancy or rental of his unit.*"

*SEC Securities Act Release No. 33-5347*, 17 C.F.R. 231.5347, 38 Fed. Reg. 1735 (Jan. 18, 1973), CCH Fed. Sec. L. Rep. 1049 (emphasis added).

A recent example of a condominium sales arrangement which was determined to lie outside the definition of "security" under the Securities Act of 1933 and SEC Release No. 33-5347, is found in SEC No-Action Letter, *Tahoe Racquet Club Condominiums* (Aug. 2, 1976), CCH Fed. Sec. L. Rep. 80,718 (owner elects whether to rent; no emphasis on rental possibilities to potential purchasers; no sales representations allowed, even if requested, re occupancy, income or other economic or tax advantages; no rent pools; management fees allowed). *See also H. Bloomenthal, Securities and Federal Corporate Law* § 2.15 (1975); Berman & Stone, *Federal Securities Law and the Sale of Condominiums, Homes, and Homesites*, 30 Bus. Law 411 (1975).

sale and where each offeree, by reason of his knowledge about the affairs of the issuer or otherwise, does not require the information which would be set forth in a registration statement under this article in order to make a reasonably informed judgment with respect to such investments."[4]

While the court of appeals correctly stated the test as to whether an offering falls within the "private offering" exemption,[5] we conclude that it erred in finding an exemption in this case.

The private offering exemption was designed principally to permit the issuance of securities in transactions in which the remedial purposes of registration were satisfied by independent factors. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). As we stated in *Central Bank & Trust ·Co. v. Robinson*, 137 Colo. 409, 326 P.2d 82 (1958);

"The test as to whether or not an offering is public is a question to be determined from the facts in each particular case. An offer can be made to a large class and not be public, and conversely, to a small class and be public. The real test is — whether the particular class of persons affected need the information made available by registration."[6]

Therefore, the predicates for the exemption must apply to the offerees *as a group* and should not be analyzed on an investor-by-investor basis. Each "offering" must be separately assessed.[7] *See SEC v. Ralston Purina*

---

[4] Section 11-51-114(2)(i), C.R.S. 1973, was amended, effective July 1, 1975, to allow exemptions for "[a]ny transaction in this state not involving any public offering *where there is no general or public advertising or solicitation* or any transaction effected in accordance with any rule or order by the securities commissioner establishing an exemption pursuant to this paragraph (i) where the securities commissioner finds that the applicability of sections 11-51-106 and 11-51-115 are not necessary or appropriate in the public interest or for the protection of investors." 1975 Sess. L., ch. 107 at 415 (emphasis added).

[5] In applying the statutory test, the court of appeals was guided by criteria established by the Colorado Division of Securities. These include: (1) the number of offerees and actual purchasers, (2) the offeree's relationship to the issuer, (3) the offeree's knowledge, (4) the manner of offering, (5) whether the offer is made in a medium intended for general distribution, and (6) a commitment by the offeree that the security is taken for investment only and not for resale or redistribution. *See Division of Securities Rules and Regulations* 8.15 (1972). Further guidance, by way of analogy to the federal exemption, may be found in SEC Rule 146, 39 Fed. Reg. 15266. *See also* Kinderman, *The Private Offering Exemption: An Examination of Its Availability Under and Outside Rule 146*, 30 Bus. L. 921 (1974).

[6] The crux of the registration requirement is disclosure of information sufficient to allow informed decision-making by the investors as a class.

[7] The determination of whether one "offering" is involved may be difficult in some factual contexts. In this case, the unitary plan for sale and management of the securities and the undisputed fact that the securities were advertised generally to the public precludes division of this offering into discrete units. The mere fact that the plaintiffs made the initial approach does not vitiate the fact that, realistically, they were treated as one in exactly the same position as an offeree responding to the general advertising. The fact of "investor initiative" in this case is thus not probative of any investor qualities which would substitute for the registration requirement. *Compare Garfield v. Strain*, 320 F.2d 116 (10th Cir. 1963). Fragmentation of the securities offering by such artificial distinctions would defeat the purposes of the exemption and invite evasion. *See* SEC Securities Act Release No. 33-2029 (Aug. 8, 1939), CCH Fed. Sec. L. Rep. 2140, 11 Fed. Reg. 10963. *See generally*, Annot. 6 A.L.R. Fed. 536 (1971 and Supp. 1975).

*Co., supra; Andrews v. Blue*, 489 F.2d 367 (10th Cir. 1973); *Hill York Corp. v. American Internat'l Franchise, Inc.*, 448 F.2d 680 (5th Cir. 1971); *Lively v. Hirschfield*, 440 F.2d 631 (10th Cir. 1971) ("The standard must be applied to all of the offerees if the *Ralston Purina* case is to be meaningfully applied."). As under the federal statute, the exemption requirements under our statute are satisfied only if "*each* offeree . . . does not require the information which would be set forth in a registration statement." An offeree is one who receives a "solicitation of an offer to buy." Section 11-51-102(8)(b), C.R.S. 1973. The class of offerees created by the general advertising in this case goes beyond the limitations of a private offering. *See Repass v. Rees*, 174 F.Supp. 898 (D. Colo. 1959); *SEC v. McBride*, 143 F.Supp. 562 (D. Tenn. 1956); *Annot.*, 6 A.L.R. Fed. 536 (1971).

 The mere fact that Crew cautioned the plaintiffs about the investment qualities of the purchase does not meet the degree of disclosure or access required by the statute. The trial court's conclusion that, as to the plaintiffs, a "full disclosure" had been made is thus inaccurate if read as a finding that the requirements of the statute had been satisfied. The statute values information over mere disclaimers.

 Moreover, because applied only to the *particular* purchaser, the finding of "full disclosure" is insufficient to invoke the exemption with regard to this offering. The burden of proof lies upon the party claiming an exemption. *SEC v. Ralston Purina Co., supra; Central Bank & Trust Co. v. Robinson, supra.* The record indicates no basis for finding that either the plaintiffs or the class of offerees involved could fend for themselves in assessing the merits of the investment. Nor is there a basis for determining that the plaintiffs would have access to or were furnished the same kind of information which would have been furnished to the public by a registration statement. *See Hill York Corp. v. American Internat'l Franchise, Inc., supra; Lively v. Hirschfield, supra.* Absent this independant basis for a reasonable determination that informed decision-making can occur, the underlying rationale for the exemption has not been met.

IV.

Misrepresentation of a Material Fact

As an alternative claim, the plaintiffs argued at trial that even if the offering was exempt from the registration requirements as a "private offering," they were entitled to relief under section 11-51-125, C.R.S.

1973. That section states, in pertinent part, that any person who:

". . . offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him . . . ."

The court of appeals mistakenly set forth the trial court's finding in the statement that "even if the sale of a *non-exempt* security were involved . . . defendants had not made any material misrepresentation." The trial court did not predicate its finding upon the possible existence of a non-exempt security, but upon the fact that the condominium sale did not constitute the sale of a security. The court of appeals also limited the claim of misrepresentation under the statute to "sale of an *exempt* security," which was error.

The claim of misrepresentation under the Colorado Securities Act does not depend upon the exempt or non-exempt status of the security. The misrepresentation may occur in the context of the registration statement for a non-exempt security, or in the promotion or negotiations for sale of an exempt or non-exempt security. Whenever the elements of misrepresentation under the statute are proven, and the defendant fails to establish the affirmative defense of lack of knowledge, the plaintiff is entitled to relief. The provisions of section 11-51-125, C.R.S. 1973, were adopted intact from the text of the Uniform Securities Act and are almost identical to 15 U.S.C. 77 1 (2) (1970). Authorities construing the Uniform Act and the federal statute are in total accord. *See Crooker v. SEC*, 161 F.2d 944 (1st Cir. 1947) (section "applicable whether or not registration statement has been filed"); 7 *Uniform Laws Annotated* § 410 (a) (2), Commissioner's Note (1970) (section "applies regardless of whether the security is registered, exempted, or sold in violation of the registration requirements."), 1 *L. Loss, Securities Regulation* 42 (1961).

The plaintiffs are entitled to the full relief mandated by the statute under our disposition of the issues in Parts I and II above. *See* section 11-51-125, C.R.S. 1973; Comment, *The Uniform Securities Act*, 12 Stanford L. Rev. 103 (1959). Therefore, we need not resolve or give consideration to the plaintiffs' claim of misrepresentation.

Accordingly, we reverse the court of appeals and remand with directions that the court of appeals direct the district court to enter judgment for the plaintiffs on their claim for rescission under the Colorado Securities Act.