2012 COA 84

**Fred J. JOSEPH, Colorado Securities Commissioner, Petitioner–Appellee,**

**and**

**Colorado Division of Securities, Appellee,**

v.

**MIEKA CORPORATION, Daro Blankenship, and Stephen Romo, Respondents–Appellants.**

**No. 11CA1080.**

Colorado Court of Appeals, Div. I.

May 10, 2012.

§ 24–51–1105, C.R.S.2011.

John W. Suthers, Attorney General, Russell B. Klein, First Assistant Attorney General, Alexander C. Reinhardt, Assistant Solicitor General, Denver, Colorado, for Petitioner–Appellee.

Davis Graham & Stubbs LLP, David A. Zisser, Michelle M. Meyer, Denver; Colorado, for Respondents–Appellants.

Andrew I. Friedman, Denver, Colorado, for Amicus Curiae North American Securities Administrators Association, Inc.

Shoemaker Ghiselli & Schwartz LLC, Paul H. Schwartz, Andrew R. Shoemaker, Boulder, Colorado, for Amicus Curiae HEI Resources, Inc.

Opinion by Judge TAUBMAN.

¶ 1 In this judicial review of a final cease and desist order issued by petitioner, Fred J. Joseph, Colorado Securities Commissioner (Commissioner), respondents, Mieka Corpo-

ration, Daro Blankenship, and Stephen Romo (collectively respondents), appeal the order prohibiting them from committing any violation of the Colorado Securities Act (CSA), sections 11–51–101 to –908, C.R.S.2011, in connection with the offer and sale of any security in or from the State of Colorado. We affirm.

## I. Background

¶ 2 This case arises out of an order issued by the Colorado Division of Securities (Division) directing the respondents to show cause why a final order should not be entered against them in conjunction with the alleged sale of securities in violation of the CSA. More specifically, the order alleged that the respondents had violated provisions of the CSA by offering for sale interests in a joint venture to develop an oil and gas lease in Pennsylvania (the Joint Venture).

¶ 3 At the administrative hearing, division employee David Swafford testified that he had received calls from Romo soliciting his participation in the Joint Venture, and that he had no previous relationship with the respondents. Swafford testified that Romo explained that he would have to contribute $158,400 to purchase a unit in the Joint Venture. After expressing interest in participating, Swafford received a package from the respondents including a Confidential Information Memorandum (CIM), which included the proposed Joint Venture Agreement. The CIM explained that the total offering price was $3,960,000, and that if all twenty-five units sold, the Joint Venture would acquire a forty-four percent working interest in two oil and gas wells. According to the CIM, the respondents developed the Joint Venture's well drilling proposal as a general partnership under Texas law.

¶ 4 Although Swafford did not ultimately purchase an interest in the Joint Venture, the Division identified another investor in Colorado who had allegedly done so.

¶ 5 Following the hearing, the Division, through a hearing panel (Panel), issued a detailed opinion concluding, among other things, that the evidence presented established that the interests in the Joint Venture were securities under the CSA and that

there had been an offer and a sale of such security interests. Reviewing "the substantive economic realities of the transaction," the Panel determined that the Joint Venture agreement constituted an investment contract and therefore, interests in the Joint Venture constituted securities under the CSA. Because those securities had not been registered with the Division, the Panel recommended that the Commissioner issue a cease and desist order against the respondents to enjoin them from violating the CSA.

¶ 6 In April 2011, the Commissioner affirmed the decision of the Panel after adopting its findings of evidentiary fact. The Commissioner also affirmed the Panel's conclusions of law, with two exceptions: (1) the Commissioner concluded that "the strong presumption that general partnerships are not securities as found in the *Williamson* case [*Williamson v. Tucker*, 645 F.2d 404 (5th Cir.1981)] is not the law under the Colorado Securities Act"; and (2) although the Panel had concluded that Romo had acted as an unlicensed sales representative in violation of the CSA, the Commissioner concluded that he had acted as an unlicensed broker-dealer or sales representative in violation of section 11–51–401(2), C.R.S.2011. The validity of these two legal conclusions is the primary issue raised by the respondents on appeal.

## II. Applicable Standard of Review

¶ 7 Appellate courts review a Commissioner's final order under the standard set forth in section 24–4–106(7), C.R.S.2011. §§ 11–51–607(1), 24–4–106(11), C.R.S.2011. Accordingly, we affirm the order unless we find that the agency action was arbitrary and capricious, an abuse of discretion, or based on findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence, or otherwise contrary to law. § 24–4–106(7); *see Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1247 (Colo.2001).

¶ 8 Findings of ultimate fact involve a conclusion of law, or a mixed question of law and fact, and settle the rights and liabilities of the parties. *State Bd. of Med. Examiners v. McCroskey*, 880 P.2d 1188, 1193 (Colo.

1994). We uphold the Commissioner's findings of ultimate fact that have a reasonable basis in law and are supported by substantial evidence in the record viewed as a whole. *Black Diamond Fund, LLLP v. Joseph,* 211 P.3d 727, 730 (Colo.App.2009); *Westmark Asset Mgmt. Corp. v. Joseph,* 37 P.3d 516, 520 (Colo.App.2001). Substantial evidence is sufficient probative evidence to adequately support a conclusion, without regard to the existence of conflicting evidence. *Black Diamond Fund,* 211 P.3d at 730; *Westmark Asset Mgmt.,* 37 P.3d at 520.

¶ 9 Findings of evidentiary fact, the detailed factual or historical findings upon which a legal determination rests, will not be set aside unless they are contrary to the weight of the evidence. *See McCroskey,* 880 P.2d at 1193.

¶ 10 In contrast, although we afford deference to an agency's reasonable interpretation of its enabling statute and regulations, we are not bound by its conclusions of law. *See Black Diamond Fund,* 211 P.3d at 730

### III. Existence of Securities

¶ 11 The Panel and the Commissioner found the respondents sold unregistered securities in violation of section 11–51–301, C.R.S.2011, based on their conclusion that the Joint Venture interests were interests in an investment contract. The respondents contend that this conclusion was based on an erroneous view of the law, or alternatively, unsupported by substantial evidence in the record. We do not address the first contention and disagree with the second.

### A. Legal Framework

¶ 12 It is unlawful to offer or sell a security in Colorado unless it is registered or exempt under the CSA. § 11–51–301.

■ ¶ 13 Although an interest in a general partnership or a joint venture is not defined as a security under section 11–51–201(17), C.R.S.2011, a "security" includes an "investment contract." § 11–51–201(17); *Feigin v. Digital Interactive Associates, Inc.,* 987 P.2d

876, 881 (Colo.App.1999). Whether a particular transaction involves a security depends on the substantive economic realities underlying the transaction, not on the name or the form of the instrument. *Joseph v. Viatica Mgmt., LLC,* 55 P.3d 264, 266 (Colo.App. 2002). Applying an economic realities analysis to the Joint Venture, the Panel found, and the Commissioner adopted its finding, that the Joint Venture was an investment contract and therefore a security.

■ ¶ 14 "[A]n investment contract ... [is] [ (1) ] a contract, transaction or scheme whereby a person invests his money [ (2) ] in a common enterprise and [ (3) ] is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In determining whether an investment contract exists, Colorado courts apply this three-part *Howey* test. *Lowery v. Ford Hill Inv. Co.,* 192 Colo. 125, 130–31, 556 P.2d 1201, 1205 (1976).

¶ 15 The parties agree with the Commissioner's finding that the purchase of a unit in the Joint Venture was an investment transaction in a common enterprise. However, they disagree with his finding that any profits were expected to come from the entrepreneurial or managerial efforts of a third party. *See Toothman v. Freeborn & Peters,* 80 P.3d 804, 811 (Colo.App.2002). The respondents contend that the Commissioner erred in finding this third element satisfied. According to the respondents, (1) the Commissioner erred in not applying the *Williamson* presumption and (2) his conclusion was unsupported by substantial evidence. We address each contention in turn.

### B. *Williamson* Presumption

¶ 16 The CIM and the Joint Venture Agreement contained therein identify the Joint Venture as a general partnership organized under Texas law and the investors as general partners. The Panel and the Commissioner analyzed the Joint Venture as a general partnership on its face, and the parties do not contest that conclusion on appeal.[1]

---

**1.** We note, however, that not all agree with the respondents' cursory statement that a joint ven-

ture has the same "legal identity" as a general partnership. *See generally* George E. Reeves,

¶ 17 The parties contest whether this general partnership was illusory and whether the investors expected profits primarily from the efforts of others. In *Williamson*, 645 F.2d 404, the Fifth Circuit analyzed this very question. First, it affirmed that courts should analyze the third *Howey* factor in a general partnership with an understanding that the "economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests." *Id.* at 418; *see Feigin*, 987 P.2d at 881 (adopting focus on economic form over substance). The court then discussed scenarios that might render a general partnership illusory and formulated a flexible three-pronged analysis to determine whether a general partnership was an investment contract. The *Williamson* court stated:

> A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

645 F.2d at 424; *accord Feigin*, 987 P.2d at 882. The Fifth Circuit noted that an investor claiming that a general partnership is actually an investment contract "has a difficult burden to overcome." 645 F.2d at 424. Even though the *Williamson* court did not use the term "presumption," this proposition has come to be known as the *Williamson* presumption. *See Toothman*, 80 P.3d at 811.

¶ 18 No Colorado appellate court has expressly adopted or rejected the *Williamson* presumption. *See Feigin*, 987 P.2d at 882 (applying *Williamson's* economic reality test without addressing the presumption); *see also People v. Robb*, 215 P.3d 1253, 1262 (Colo.App.2009) (retroactive application of *Feigin's* holding that "whether a general partnership is a security is to 'be made on the basis of substance, or economic reality, not form'" did not violate defendant's due process right; not addressing the presumption that a general partnership is a security). However, in *Toothman*, 80 P.3d at 811, in determining that the *Williamson* presumption does not apply to limited liability partnerships, a division of this court remarked that "an interest in a general partnership is presumed not to be an investment contract." Nevertheless, the *Toothman* division did not expressly rule on the applicability of the *Williamson* presumption.

¶ 19 Here, the Panel concluded that the factors cited in *Williamson* and *Feigin* guided its economic realities analysis of the Joint Venture. Without applying the so-called *Williamson* presumption, it concluded that interests in the Joint Venture constituted securities. The Panel further stated: "Our conclusion ... would not differ if the presumption outlined in *Williamson* were applied to the interests in the Joint Venture and the facts of this case."

¶ 20 As noted, the *Williamson* court articulated three relevant factors in any economic realities analysis of a general partnership: (1) whether a partnership agreement distributes power among partners similar to a limited partnership; (2) the level of experience and knowledge of the partners in the partnership's business affairs; and (3) the dependence of the partners on the "unique entrepreneurial or managerial abilit[ies]" of the promoter or manager. 645 F.2d at 424. In concluding the challenged general partnership in *Feigin* was an investment contract, the division relied on the following factors: (1) the sophistication and vulnerability of the solicited investors; (2) that the investors would be strangers to the promoter and (3) strangers to each other; (4) that the investors would be geographically scattered; (5) that the investors would be solicited regardless of the existence of any expertise or prior

*Partnership Status of Joint Ventures in Colorado,* 24 Colo. Law. 2553–56 (Nov. 1995) (discussing the "diversity of opinion" in Colorado that a joint venture is a partnership).

interest in the partnership's business; (6) that there would be a very large number of partners; and (7) that the management of the partnership would be vested in a management committee with expertise. 987 P.2d at 883. Such factors are helpful in determining "whether a particular transaction involves a security ... not on the name or the form of the instrument." *See Viatica Mgmt.*, 55 P.3d at 266.

¶ 21 The Commissioner adopted all of the Panel's findings of fact and conclusions of law to the extent they were consistent with the cease and desist order. Unlike the Panel, however, the Commissioner expressly concluded that the *Williamson* presumption does not apply in Colorado. The respondents contend that the Commissioner's rejection of the *Williamson* presumption was erroneous.

¶ 22 We need not address this contention because, contrary to the respondents' contention, we conclude the Commissioner's refusal to apply the *Williamson* presumption was not dispositive.

■ ¶ 23 Our duty on review is "to 'decide actual controversies by a judgment which can be carried into effect, not to declare principles or rules of law' which cannot affect the matter at issue before [us.]" *Well Augmentation Subdistrict v. City of Aurora*, 221 P.3d 399, 416 (Colo.2009) (quoting *Barnes v. Dist. Court*, 199 Colo. 310, 312, 607 P.2d 1008, 1009 (1980)).

■ ¶ 24 We may also affirm the Commissioner's legal conclusion on any grounds supported by the record. *See Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo.App.2004).

¶ 25 Here, the Commissioner's rejection of the *Williamson* presumption was unnecessary to resolve whether the Joint Venture interests were securities because he adopted the Panel's conclusion that the Joint Venture interests were securities, and the Panel explained that its conclusion would have been the same if the presumption had applied. Thus, the application of the *Williamson* presumption was not dispositive of the adminis-

trative proceeding and the Commissioner's statement of law concerning it is not ripe for judicial resolution.[2] *See, e.g., Maryland Cas. Co. v. Messina*, 874 P.2d 1058, 1061–62 (Colo. 1994) (in a workers' compensation proceeding, a determination unnecessary to the resolution of the case had the "characteristics of dicta," was not a proper subject for appeal, and therefore was not precluded under collateral estoppel (quoting Restatement (Second) of Judgments § 27 cmt. h (1982))).

## C. Substantial Evidence

■ ¶ 26 We next determine whether the Commissioner's decision was supported by substantial evidence in the record. *See Westmark*, 37 P.3d at 520. In so doing, we are mindful of the economic realities factors articulated in *Williamson* and *Feigin*, discussed above.

¶ 27 After hearing the testimony of five witnesses and examining numerous exhibits introduced at the hearing, the Panel made extensive findings concerning the economic realities of the Joint Venture. *See Lowery*, 192 Colo. at 130, 556 P.2d at 1205 (mandating "close attention to the facts of each case and a substantive appraisal of the commercial realities of the offering").

¶ 28 The Panel found the Joint Venture Agreement lacked the "hallmarks of a traditional bona fide general partnership" in the following ways:

- The investors lacked the right or ability to vote on the admission or exclusion of new investors.

- Investors could not bind the Joint Venture.

- No votes or other actions had been taken by investors concerning management decisions even though the Joint Venture was under way.

- Contrary to the respondents' contention that the management powers afforded to investors in the Joint Venture Agreement are typical of a general partnership, those powers are also typically contained in limited partnership

---

**2.** The Division and both amici curiae concede that we need not address the Commissioner's rejection of *Williamson*, despite urging us to do so.

agreements and are similar to those granted to corporate shareholders. The Panel also found that, although the Joint Venture Agreement allows for removal of the operator, Mieka LLC, the percentage of votes required precludes the investors themselves from executing removal.

¶ 29 The Panel also found that the respondents did not inquire into or assess investors' specific knowledge or sophistication concerning the Joint Venture activity or oil and gas development and therefore could not assess "how an investor might exercise management rights or powers ... in any intelligent or meaningful way." The Panel also determined that the respondents marketed the investments as "passive" and delegated the day-to-day operations and management to noninvestors.

¶ 30 Additionally, the Panel found that, unlike in most "traditional bona fide partnerships," the respondents solicited a large number of investors with whom they had no prior relationship.

¶ 31 The Panel also considered, but rejected as controlling, that the Joint Venture Agreement provided for joint liability of all investors, a traditional characteristic of general partnerships. It concluded that this factor did not outweigh the other economic realities of the Joint Venture.

¶ 32 The Panel then concluded that the Joint Venture interests were investment contracts, and the Commissioner agreed.

¶ 33 The respondents nevertheless contend that the Commissioner's ultimate conclusion is unsupported by any evidence that the powers provided to the venturers were illusory.

¶ 34 The respondents argue that the Division failed to demonstrate how the Joint Venture actually worked beyond the four corners of the CIM and Joint Venture Agreement. However, because the Joint Venture is in its early stages, assessment of the economic realities required review of the documents, and the respondents themselves emphasized the importance of these documents as a starting point. Indeed, the respondents relied on these documents to rebut the Commissioner's contention that the Joint Venture is an illusory general partnership.

¶ 35 We therefore conclude that the documents contained sufficient evidence to support the Panel's and the Commissioner's conclusion.

¶ 36 Nor are we persuaded that the pre-formation activities did not support the Panel's and the Commissioner's application of the economic realities test to determine whether the Joint Venture was an investment contract. The respondents have not cited, and we have not found, any published appellate decision holding that preformation activities do not factor into the economic realities analysis.

¶ 37 To the contrary, the respondents' extensive pre-formation activities supported the Panel's and the Commissioner's conclusions that joint venturers were dependent on the respondents' entrepreneurial or managerial ability. To the extent that the respondents argue that their pre-formation disclosures enabled joint venturers to make informed investment decisions, the Panel was entitled to reach contrary inferences based on this evidence. *See Lawley*, 36 P.3d at 1252.

¶ 38 Although the respondents also urge us to review other factors negating that the Joint Venture was an illusory general partnership, our review is limited to determining whether enough evidence exists to support the agency's conclusion "without regard to the existence of conflicting evidence." *Westmark*, 37 P.3d at 520. Accordingly, we conclude that substantial evidence exists in the record as a whole to support the Commissioner's decisions that the Joint Venture was an illusory general partnership and therefore interests in it were investment contracts.

### IV. Improper Rulemaking

¶ 39 The respondents next contend that the Commissioner's rejection of the *Williamson* presumption was tantamount to rulemaking and violated rulemaking procedures mandated by the Colorado Administrative Procedure Act (APA). We disagree.

¶ 40 Noncompliance with the statutory requirements for rulemaking "is fatal to [an] agency's rule-making actions." *Home Builders Ass'n v. Pub. Utilities Comm'n*, 720

P.2d 552, 562 (Colo.1986). In determining whether an agency has regularly pursued its statutory authority, we are not bound by the label attached to agency actions. *Id.* at 560–61. Rather, we review de novo the substance of what the agency has done and determine whether it complied with the statute. *See id.*

¶ 41 Under the APA, a "rule" connotes "the whole or any part of every agency statement of general applicability and future effect implementing, interpreting, or declaring law or policy or setting forth the procedure or practice requirements of any agency." § 24–4–102(15), C.R.S.2011. An agency is generally required to provide notice and grant parties an opportunity to participate in the promulgation of any rule. § 24–4–103, C.R.S.2011. An agency is exempt from notice and hearing requirements, however, when it promulgates an interpretative, rather than legislative, rule or general statement of policy. § 24–4–103(1), C.R.S.2011.

■■ ¶ 42 An interpretive rule serves an advisory function. It explains the meaning of a term in a statute or other rule, and "describes the type of factors which an agency will consider in future administrative proceedings without, however, binding the agency to a particular result." *Regular Route Common Carrier Conference v. Pub. Utilities Comm'n,* 761 P.2d 737, 748–49 (Colo. 1988).

¶ 43 Even if we assume that the Commissioner's pronouncement regarding *Williamson* amounted to a rule as the respondents contend, it would be an interpretative rather than a legislative rule and therefore exempt from the notice and hearing rulemaking requirements. The absence of the *Williamson* presumption did not bind the Panel or the Commissioner to a particular result here. Nor would it so bind future decisionmakers. Instead, it serves to guide a hearing panel's analysis of whether interests in a particular general partnership constitute securities. *Cf. Hammond v. Pub. Employees' Ret. Ass'n,* 219 P.3d 426, 428 (Colo.App.2009) (rule which "require[d] a particular action (and thus

achieve[d] a particular result)" was legislative rule).

¶ 44 According, we reject the respondents' contention that the Commissioner engaged in improper rulemaking in violation of section 24–4–103.

## V. Broker–Dealer Violations

■■ ¶ 45 The respondents next maintain that, because neither the Panel nor the Commissioner expressly found that Mieka or Blankenship was a broker-dealer or issuer, the Commissioner's finding that they violated section 11–51–401(2) was unsupported by the evidence. We perceive no error.

¶ 46 Under section 11–51–401(2): "Neither a broker-dealer nor an issuer shall employ or otherwise engage an individual to act as a sales representative in [Colorado] unless the sales representative is licensed or exempt from licensing...."

¶ 47 The Panel found that Mieka and Blankenship "engaged ... Romo as an unlicensed sales representative in violation" of this section.[3] The Commissioner adopted that finding.

¶ 48 The respondents contend that this finding was erroneous because the Panel and the Commissioner did not expressly find, and the record does not establish, that Mieka and Blankenship were issuers or broker-dealers. We disagree.

■■ ¶ 49 An agency's findings "need not be in any particular form, but may be implied from other facts." *Colorado Office of Consumer Counsel v. Pub. Utilities Comm'n,* 786 P.2d 1086, 1091 (Colo.1990). The Panel's and the Commissioner's conclusion that Mieka and Blankenship violated section 11–51–401(2) is based on the premise that they are issuers or broker-dealers.

¶ 50 However, even if we assume that Mieka and Blankenship are not issuers, we need only determine whether substantial evidence exists to support the finding that they are "broker-dealers." This term connotes in relevant part a person, not including a sales

---

3. The Commissioner found that Mieka and Blankenship "employed or otherwise engaged unlicensed sales agents to acts as sales represen-tatives in Colorado in violation of section 11–51–401(2), C.R.S."

representative or issuer, "engaged in the business of effecting purchases or sales of securities for the accounts of others." § 11–51–201(2), C.R.S.2011.

¶ 51 The Panel found that Romo "attempted to effectuate purchases and sales of the interests in the Joint Venture" and therefore was a sales representative. This finding of ultimate fact was based on, among other evidence, Romo's testimony that he contacted potential investors to solicit their investment in the Joint Venture and to qualify them as venturers.

¶ 52 The Panel further found that Mieka and Blankenship engaged and authorized Romo to act as a sales representative on behalf of the Joint Venture. This finding was supported by Romo's testimony that he was employed and given a call list by Mieka and managed exclusively by Blankenship in qualifying investors.

¶ 53 In making its findings, the Panel concluded that a broker-dealer may be construed as engaging in the business of buying or selling securities by authorizing and employing a sales representative on his or her behalf. We conclude that such an interpretation is reasonable. *See Black Diamond Fund,* 211 P.3d at 730 (affording deference to a reasonable interpretation).

¶ 54 Accordingly, we conclude the Panel's finding, adopted by the Commissioner, that Mieka and Blankenship violated section 11–51–401(2), was supported by substantial evidence and had a reasonable basis in the law.

## VI. Breadth of Cease and Desist Order

¶ 55 The respondents contend that the Commissioner exceeded his authority under section 11–51–606(1.5)(d)(IV)(A) in ordering them to cease and desist from any violations or future violations of section 11–51–501, C.R.S.2011, and other provisions of the CSA because such violations were not specifically alleged or found. We are not persuaded.

¶ 56 If the Commissioner reasonably finds that any person against whom he has entered an order to show cause has engaged, or is about to engage, in acts or practices constituting violations of sections 11–51–301, 11–

51–401, or 11–51–501, he or she may issue a final cease and desist order imposing sanctions, including "[d]irecting such person to cease and desist from further unlawful acts or practices." § 11–51–606(1.5)(d)(IV)(A).

¶ 57 The Commissioner ordered the respondents to immediately cease and desist from:

(a) In connection with the offer and sale of any security in or from the State of Colorado, committing or causing any violations and any future violations of [sections] 11–51–301, –401, and –501, C.R.S., or

(b) Otherwise engaging in conduct in violation of any provision of the [CSA], [sections] 11–51–101, *et seq.,* C.R.S.

¶ 58 In *Black Diamond Fund,* a division of this court analyzed sanctions in a cease and desist order of the Commissioner practically identical to those ordered here. 211 P.3d at 738. There, the Commissioner ordered the respondents to cease and desist from causing any violations of sections 11–51–301, –401, and –501, and engaging in conduct in violation of the CSA. The division stated that the Commissioner "[e]ssentially ... ordered respondents to comply with Colorado law." *Id.* We find persuasive the division's rationale. Similarly, here, the Commissioner did not order the respondents to cease and desist from specific conduct not addressed; rather, he ordered them to cease and desist from all violations of the law. Accordingly, we discern no abuse of discretion. *See id.* ("We also find nothing arbitrary or capricious in the terms of a cease and desist order that mandates compliance with [the CSA].").

## VII. Procedural Violations

¶ 59 Finally, the respondents contend that the Commissioner's order is premised on two procedural defects that amounted to an abuse of discretion. Specifically, they argue that (1) Swafford's conduct constituted entrapment and (2) the Division deprived them of proper notice concerning Swafford. Again, we disagree.

## A. Entrapment

¶ 60 After the Panel's hearing, the respondents filed a motion to dismiss the proceeding against them on the ground that Swafford and the Division had conducted an undercover operation inducing them to offer to sell an interest in the Joint Venture that they would not otherwise have offered. The respondents characterize this argument as a "claim of entrapment." We decline to address this defense because it is unavailable in administrative proceedings as a matter of law. *See Black Diamond Fund,* 211 P.3d at 730 (application of legal standards reviewed de novo); *Jones v. Civil Service Comm'n,* 176 Colo. 25, 30, 489 P.2d 320, 322 (1971); *see also Bourie v. Dep't of Higher Educ.,* 929 P.2d 18, 21 (Colo.App.1996) (administrative proceedings resulting in corrective actions against complainant were administrative in nature and not analogous to criminal prosecution; therefore complainant was not afforded criminal procedural protections under *Jones* ); *cf. Patty v. Bd. of Med. Examiners,* 9 Cal.3d 356, 107 Cal.Rptr. 473, 508 P.2d 1121, 1129 (1973) (defense of entrapment available in California administrative proceedings to revoke or suspend professional licenses).

¶ 61 The respondents were charged, and sanctioned, only with the violation of CSA rules and not with any criminal offenses. Therefore, the defense of entrapment was not available to them. *Jones,* 176 Colo. at 30, 489 P.2d at 322.

## B. Notice

¶ 62 The respondents also contend that the Division's characterization of Swafford as a Colorado investor known as "DS" on the petition and witness list, rather than an employee of the Division, violated their statutory right to notice of the factual and legal basis for the petition. We disagree.

¶ 63 When an agency acts in a quasi-judicial capacity, procedural due process requires that the agency give notice and afford a hearing to affected individuals. *Bourie,* 929 P.2d at 22. However, "the notice required in an administrative proceeding does not require the same formality, specificity, and detail that is required in a criminal pro-

ceeding." *Id.* Notice must comply with the agency's own rules and be sufficient to notify a complainant of the purpose of and matters to be addressed at a hearing. *Id.*

¶ 64 The Division's enacting statutes and rules provide that, to commence a cease and desist order, it must file a petition to show cause, clearly and concisely stating the facts which are the grounds for the unlawful act or practice in question, the relief sought, and any other additional supporting information or documents. Commission Rule 51–6.3.E.2, 3 Code Colo. Regs. 704–1. A panel of the Division must hear the matter within ten to thirty-five days following service of the petition. Commission Rule 51–6.3.E.4. Parties must also file statements identifying witnesses and the substance of expected testimony no later than three days before the hearing. Commission Rule 51–6.3.E.8.

¶ 65 In February 2011, the Division filed a petition for order to show cause alleging, in relevant part, that Romo contacted "a Colorado investor (hereafter identified as 'DS')" in solicitation of the Joint Venture and on behalf of Mieka. In March, three days before the hearing proceeded, the parties exchanged witness lists. The Division identified Swafford by his full name, but not as an employee of the Division. The address listed, however, was that of the Division office and identical to that of another witness who was disclosed as a Division attorney.

¶ 66 The respondents argue that the Division insufficiently notified them of Swafford's identity and employment in the petition and witness list and that the insufficient notice reduced their time to prepare impeachment of the witness from thirty days to three days. However, the rules only provide for three days notice of a witness's identity, and the respondents received Swafford's full name and his employment address three days before the hearing. A reasonable, diligent inquiry by the respondents would have disclosed that Swafford was a Division employee. *See Burman v. Richmond Homes Ltd.,* 821 P.2d 913, 919 (Colo.App.1991) ("the receipt of inquiry notice charges a party with notice of all facts that a reasonably diligent inquiry would have disclosed"). Accordingly,

the respondents had inquiry notice of Swafford's full identity within the time afforded by the Division's rules.

¶ 67 Even if the notice was insufficient because the Division did not disclose Swafford's full identity, the respondents have not shown prejudice. *See Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir.1993) ("The harmless error rule applies to judicial review of administrative proceedings, and errors in such administrative proceedings will not require reversal unless [p]laintiffs can show they were prejudiced."); *accord Sheep Mountain Alliance v. Bd. of County Comm'rs*, 271 P.3d 597, 606 (Colo.App.2011).

¶ 68 The respondents cross-examined Swafford at the hearing about why he was contacted as a Colorado investor, whether he had lied to Romo about his employment, and the information he received from the respondents. The respondents have not articulated what they would have done differently if they had had additional time to prepare Swafford's impeachment.

¶ 69 Nor did the respondents request a continuance after being put on inquiry notice of Swafford's employment status by the witness list.

¶ 70 Accordingly, because the respondents have not shown how they were prejudiced by the alleged notice defect, we perceive no abuse of discretion by the Division or the Commissioner.

¶ 71 The order is affirmed.

FOX and ROTHENBERG *, JJ., concur.